Decided 4 December, 1906.

## NODINE v. RICHMOND.

87 Pac. 775.

ACCOUNTING BY TRUSTEES—EFFECT OF EVIDENCE.

1. The evidence affirmatively shows that the trustees fully accounted to Fred Nodine in writing for the property transferred to them, and that they did not have in their hands sufficient funds arising from the trust property to have prevented the sales of the real property of Nodine under the executions on which it was sold.

ACCOUNTING—EVIDENCE OF FRAUD BY TRUSTEES.

2. The evidence entirely fails to show any fraud or conspiracy between the trustees and the creditors of Fred Nodine, or any of them, to injure his interests or advance their own.

INADEQUACY OF PRICE AS EVIDENCE OF FRAUD.

3. Mere inadequacy of price on an execution sale, where the parties stand on an equal footing, and where there are no confidential relations between them, is insufficient to set aside the sale, unless the inadequacy is so gross as to amount to proof of fraud or to shock the conscience.

EXECUTION SALE—EVIDENCE OF INADEQUACY OF PRICE.

4. A review of the evidence as to the value of the Nodine land transferred by him to trustees and afterward sold on execution under prior liens, does not show that the sales were made for an inadequate price.

EXECUTION SALE—EVIDENCE OF CHILLED BIDDING.

5. The fact that, while property was being offered for sale under execution in favor of a bank, an officer of the bank told one who made a bid that the lands were being sold subject to mortgages thereon, whereupon the bidder went away and the officer purchased, does not show the preventing of competitive bidding so as to warrant the setting aside of the sale where the representation was true.

SALES—EVIDENCE OF COLLUSION WITH TRUSTEE.

6. The evidence does not show that W. T. Wright colluded with various parties to purchase for his secret benefit part of the Fred Nodine land that had been transferred to him as trustee.

LANDLORD AND TENANT—EXECUTION SALE AGAINST LANDLORD.

7. A tenant is not estopped by his relation to the landlord from purchasing the demised land at an execution sale against the landlord.

EXECUTION SALE—EVIDENCE OF INADEQUACY OF PRICE.

8. Where land sold on execution was sold some time later for very little more than the purchase price, and after a dispute existing at the time of the sale as to riparian claims had been settled in favor of the lands, no such inadequacy is shown as to warrant a setting aside of the sale.

EVIDENCE OF CONSIDERATION FOR DEED.

9. The evidence preponderates to the effect that the quitclaim deeds given by Fred Nodine and wife January 3, 1897, were given for a valuable consideration to convey an inchoate right of dower, and should not be cancelled.

NEED OF SERVING AMENDED PLEADINGS.

10. Under Section 100, B. & C. Comp., providing that amended complaints must be served on adverse parties, a decree based on an amended complaint that was not served cannot be sustained.

COSTS IN EQUITY CASES—DISCRETION.

11. The awarding of costs in equity cases is discretionary under Section 566, B. & C. Comp.

From Union: ROBERT EAKIN, Judge.

Statement by MR. JUSTICE HAILEY.

This suit is brought by Fred and Eliza Nodine for an accounting by the defendants F. L. Richmond and W. T. Wright as trustees of certain personal property transferred and certain lands conveyed to them by the plaintiffs under a contract, hereinafter set out, between the plaintiff Fred Nodine and the defendant F. A. E. Starr, and for $150,000 damages against such trustees for permitting the sale of such lands upon executions issued from judgments and a mortgage existing against the plaintiff Fred Nodine at the time he conveyed the lands to said trustees, and to recover such lands or the value thereof from the purchasers at sheriff's sale, and cancel certain deeds thereto.

The facts are substantially as follows:

In April, 1894, the plaintiff Fred Nodine owned about 3,660 acres of land in Union County, Or., known as the "Nodine Farm," and also a large amount of personal property, consisting of about 275 head of range horses, about 400 head of cattle and 250 hogs, and a lot of farm implements and machinery, including a threshing machine, engines, hay balers and other usual farm equipment, such as wagons, harness and horses. He also owned a judgment against one J. Q. Shirley for about $2,000, upon which execution had issued, and the sheriff of Union

County then held under attachment certain live stock and farm implements. He also had an interest in certain first-mortgage bonds of the Union Railway Co. pledged to him as security by the owner of the bonds. At this time he was indebted to various persons on secured and unsecured claims to the amount of about $57,500. About $30,000 of this was secured by mortgages upon his lands, nearly all of which were mortgaged. About $20,000 of it was in the form of a dozen or more judgments against him, which were liens against all his lands, and the remainder was unsecured notes and accounts and unpaid taxes. Among the judgments against him was one for over $1,600 and attorney fees and costs in favor of John W. Couper, entered in 1893, and aferwards, in 1894, sold and assigned to the defendant J. P. Marshall. The First National Bank of Union also held two judgments against him, each entered in 1893, one for $2,400 and attorney fees and costs, and the other for $6,739 and costs, all of which judgments will be referred to hereafter. Times were hard, money scarce and difficult to secure. Values were low and farm products and live stock did not find a ready market at any price. In fact, conditions were such that a financial panic prevailed over the entire country, and many men of property were forced to sacrifice all to meet their creditors. Under these conditions, with a large amount of his indebtedness then due and pressing for payment, and his property in danger of being sacrificed by actions and suits, and wasted and consumed in expenses and litigation without paying his indebtedness, he entered into negotiations with the defendant Starr to devise some means whereby he might pay his debts and have something left from his property, if possible. Before entering into the contract hereinafter set out, it was first suggested that one trustee be appointed and bonds required of him for the faithful performance of his duties, but it was later arranged that, in lieu of such bond, the defendant Wright, a friend and fellow townsman of Nodine, in whom he had confidence and whom he selected, should be made cotrustee with defendant Richmond, who had been selected by Starr. The following agreement was then signed by the parties:

"This Agreement made and entered into this 11 day of April,

(48th Or.—34)

A. D. 1894, by and between Frederick Nodine, of Union, Union County, Oregon, and F. A. E. Starr of Portland, Oregon, Witnesseth:

That Whereas the said Frederick Nodine is the owner of certain real estate in Union County, Oregon, particularly described as follows, to wit: Section 32, the South one half and North West Quarter of Section 33, the South half of the South West Quarter and East half of Section 29, all in Township Three South of Range 39 East W. M. and the West half of the West half of Section 2, the East half and the North West Quarter and the North half of the South West Quarter of Section 3, Section 4, the North half and about 20 acres included within the meander line of the Tule Lake in the North East corner of the South East Quarter of Section 5, the North half of the North half of Section 9 all in Township 4 South of Range 39 East W. M. and the South West Quarter and South West Quarter of South East Quarter of Section 6 and North half of North East Quarter of Section 7 all in Township 4 South of Range 40 East W. M. all of said lands being situated in Union County, Oregon, and including the land known as the Tule Lake conveyed by the State of Oregon to said Frederick Nodine;

And Whereas the said Frederick Nodine is largely indebted to numerous persons for large sums of money due and to become due, a list of his creditors and the amount owing to each being hereto attached marked 'Exhibit A' and made part of this agreement;

And Whereas the said Frederick Nodine is desirous of making some arrangement for the purpose of disposing of said lands for the purpose of paying said claims and demands:

Now, Therefore, the said Frederick Nodine for a valuable consideration, upon the signing of these presents, hereby agrees to convey by deed of general warranty all his right, title and interest of, in and to the lands hereinbefore described to F. L. Richmond of Portland, Oregon, and W. T. Wright of Union, Oregon, in trust however upon the terms and conditions following, to wit: To dispose of the said lands so soon as the said Richmond and Wright in their judgment may consider it for the best interest of the said Nodine for a price not less than $27.50 per acre, the terms of the sale to be such as to secure the purchase price of the said lands in a manner satisfactory to the said Nodine. Out of the proceeds of the sales of the said lands, or the proceeds of any other property, rights or choses in action, which may be assigned or transferred to said trustees under this agreement, the said trustees are to pay the debts of the said Frederick Nodine hereinbefore referred to and mentioned in the

said Exhibit A, hereto attached, and also all taxes against the said lands and all interest and costs that may accrue upon or by reason of the said indebtedness.   The remainder of the proceeds of the sales of the said real property, and of any and all other property, rights or choses in action assigned or transferred to the said trustees under this agreement, and the remainder of the said property remaining in the hands of the said trustees unsold, shall, upon the completion of the payment of the said indebtedness and the performance of the conditions herein set forth, be divided between the said Frederick Nodine and the said F. A. E. Starr, the said Nodine to receive four fifths ($\frac{4}{5}$) of such remainder and the said F. A. E. Starr one fifth ($\frac{1}{5}$) of the said remainder.

Now, Therefore,  in consideration of the premises aforesaid, the said F. A. E. Starr, hereby undertakes and agrees to conduct all the legal business necessary, made necesary or that may become necessary by reason of this agreement, and to use every effort and endeavor on his part necessary or proper for the disposal of the said property and the payment of the said indebtedness.

It is Hereby Further Agreed and understood, that all moneys arising from the sales of the said lands, and from the sales and disposal of all other property rights or choses in action, by the. said trustees under this agreement, shall be deposited in the First National Bank of Union, Oregon, in the joint name of the said trustees, and that the same shall not be drawn or paid out except upon their joint order, and that no sales of the said lands, or of any other property, rights or choses in action, assigned or transferred under this agreement, shall be made by them.

It is Further Agreed that all the costs, disbursements and expenses necessary for the carrying out of this agreement shall be borne by the said F. A. E. Starr out of the one-fifth ($\frac{1}{5}$) interest which he shall receive by reason of this agreement.

In Witness Whereof the said parties have hereunto set their hands and seals the day and year first above written."

Exhibit A, referred to in the foregoing agreement, contains a list of the amounts and character of his indebtedness, aggregating about $45,000, and enumerated among others the three judgments hereinbefore mentioned.   He was, however, indebted about $12,500 additional on two mortgages, one judgment, unpaid taxes and interest, not mentioned in the exhibit.   On April 12, 1894, pursuant to this agreement, the plaintiff and his wife

deeded to the defendants Richmond and Wright, by deed absolute upon its face, but in fact a trust deed, all of the lands then owned by plaintiff, consisting of about 3,660 acres of farm and grazing lands, and thereafter delivered to them all his personal property, except the 275 head of range horses and 30 head of range cattle, and the trustees assumed charge of the lands and personalty, and conducted the farming operations upon the lands with plaintiff's knowledge, consent and partial assistance until the fall of 1895, the management thereof being largely in the hands of defendant Richmond, but with knowledge on the part of Nodine of all that was done, and sufficient knowledge on the part of Wright to make him equally liable therefor with Richmond. The range horses and cattle last mentioned never came into the possession of the trustees, but were retained and sold by Nodine personally, with the consent of the trustees, and are not involved in this suit. The personal property held under the execution issued upon the judgment against Shirley was sold, and a portion thereof, consisting of a few cows and horses and farm implements, was bought in for $1,730.75 by Richmond and Wright as trustees for the plaintiff, as shown by the sheriff's return upon the execution, which is in evidence. A part of the remainder was sold to other persons and the proceeds applied on the costs of sale, including keepers' fees, and the rest of the property was released by order of the plaintiff and his attorneys to Shirley and other persons claiming it. The property so purchased was taken to the Nodine Farm and there used and disposed of with other property transferred to the trustees.

The interest of plaintiff in the first-mortgage bonds of the Union Railway Co. was $6,756.31, and was realized from the sale thereof by the trustees and charged in the account hereafter referred to. The cattle and hogs turned over to the trustees by plaintiff were sold by them with his knowledge and consent, and fully accounted for to him. The other personal property, consisting of work horses, farm implements and machinery, and that purchased at the Shirley sale, and the crops raised upon the lands, and the proceeds of such portions of the property and

crops as were sold, were used by the trustees in farming the land and in payment of pressing claims against Nodine, and what remained thereof in December, 1895, was sold to the defendant Townley as hereinafter stated.

When the trust deeds were executed, Starr and the trustees began negotiations for the sale of the lands, and had a large portion of them surveyed into small tracts, and advertised them in various ways and placed them for sale with real estate men in Union County, in Portland, and in the East, but were unable, on account of the hard times and stringent condition of the money market, to effect any sales, except for 40 acres to one D. M. Jameson for $1,400, which he paid the trustees, but $650 of this sum was paid by them to Balfour, Guthrie & Co. for the release of the mortgage held by them upon the lands sold. The trustees also bargained about 90 acres to one August Nelson, who made two payments thereon, amounting to about $702, but before paying any more the land was sold under execution issued upon the Couper judgment hereinbefore mentioned, and the trustees received nothing more therefrom. All the proceeds from these sales were fully accounted for by the trustees to plaintiff. In December, 1894, upon the written request of the plaintiff Fred Nodine, the trustees rendered him a written statement of their receipts and disbursements as trustees to that date, which shows that the farming operations for that year had not been very successful. However, they continued to farm the lands and tried to effect a sale thereof during the year 1895, but crop shortages, caused by the high water in the spring and drought in the summer, made the farming operations net small returns each year.

In the latter part of December, 1895, the trustees submitted to the plaintiff a full report of all their doings to that date, showing what they had received and how it had been expended, and that they had paid out of the proceeds from the sales of personal property, crops raised, and lands sold and bargained and from moneys advanced by Starr and Richmond about $20,000 on the plaintiff's old indebtedness. Starr and Richmond each advanced a considerable sum of money for the payment of claims pressing against the plaintiff Nodine, and Starr also bor-

rowed for that purpose $1,000 from the Ainsworth National Bank of Portland, and according to the statement of the trustees prepared by the defendant Richmond in December, 1895, there was, on account of such advances, then due Starr $3,885.06, Richmond $1,300.48, and the Ainsworth National Bank $525. This account was accompanied by vouchers for all disbursements, and the account and vouchers were all gone over and examined item by item, as the witness Starr says, by the plaintiff Nodine with the defendant Wright, and also with Starr, and fully explained to and accepted by plaintiff. Nodine also admits receiving the statement, but denies that any vouchers were furnished him, and says that he only had their word for the expenditures.

During the month of December, and about the time the account was rendered, the remaining personal property, consisting of work horses and farm implements and machinery, was sold to Townley, and the lands rented to him for a period of one year, for a lump sum of $6,000, for which he gave his note to Richmond as trustee. The testimony shows that this was done with the knowledge and consent of Nodine, who was consulted about the value of the property and the rental of the land, and about $4,000 of this note was for personal property and the rest rental of the land. The statement furnished by Richmond to Nodine in December, 1895, accounted for the disposition of all personal property received by the trustees and all lands sold by them, and all other transactions up to that time, except the sale and leasing of the land to Townley above mentioned, and this, being in the form of a note, as explained by the witness Richmond and known to the plaintiff at the time, was not included in the statement which it seems had been prepared just prior to the consummation of the transaction with Townley. The note for $6,000 given by Townley to Richmond as trustee was afterwards turned over by Richmond to the Ainsworth National Bank, presumably to secure the balance due it of $525 for money advanced, and the balance due Starr and Richmond for their advances; it appearing that Starr had borrowed from the bank the money which he advanced.

Starr and the trustees being unable to dispose of the lands, and there being no further funds or personal property, early in 1896 the judgment and mortgage creditors began pressing for payment of their claims. The defendant J. P. Marshall in January, 1896, caused an execution to be issued upon the judgment purchased by him from Couper in 1894, and had the sheriff levy upon lands upon which he had a mortgage for $4,000, subsequent in time to his judgment, and upon which Balfour, Guthrie & Co. held two mortgages for $4,000, each prior in time to his judgment, and had him also levy upon a quarter section of other mortgaged land and 280 acres of land not mortgaged, all of which lands were sold at sheriff's sale in April, 1896, under said execution, and bought by Marshall for the Ainsworth National Bank, of which he was cashier, for the amount of the judgment held by him, which sale was afterwards confirmed and a sheriff's deed executed therefor in November, 1896, after the time for redemption had expired. These lands were held by the bank until 1897, and, after paying off all prior liens, they sold them to other persons who are not parties to this suit for $19,800, taking their notes for the greater portion of the purchase price, the sum paid being about the amount of the mortgages and other claims against the land at the time it was purchased by the bank.

Shortly after the execution had been issued upon the Couper judgment by Marshall the plaintiff Nodine requested the defendant Wright, who was and had been for several years president of the First National Bank of Union, to have an execution issued upon the judgment held by the bank against the plaintiff for over $6,000, which was subsequent to the Couper judgment, stating to him at the time that it looked as if plaintiff's lands would have to go, as his creditors were pressing, and he wanted the bank to try to make itself whole on what was due it. Acting upon this request, Wright had an execution levied upon all of the plaintiff's lands not covered by the execution in the Couper case, and the lands were offered at sheriff's sale and sold in May, 1896, and bought by the defendant Townley for $110, subject to the mortgages and all other liens thereon—there being a mort-

gage for $5,000 in favor of S. D. Townley, brother of defendant Townley, upon a portion of the lands, and another mortgage for $5,000 in favor of the Western Hawaian Investment Co. upon another portion of the lands, and a mortgage for $3,600 in favor of J. F. F. Brewster, and one for over $690 held by the Farmers' & Traders' Bank of La Grande, Oregon, upon another portion of the lands, and other claims thereon, and, in addition thereto, there was a question as to the title to portions of the lands embraced in what was known as the "meander lines" of Tule Lake, these being lands purchased from the state as swamp lands, to which patent had not then issued from the United States. This sale was also confirmed by the court, and, no redemption having been made, a sheriff's deed was executed therefor to defendant W. J. Townley.

On January 15, 1896, the Farmers' & Traders' Bank of La Grande began foreclosure proceedings upon its mortgage covering the lands in the Brewster mortgage, and also claimed that the lands embraced in its mortgage included a part of the lands in the Western Hawaian Investment Company's mortgage within the meander lines of Tule Lake, and made the last-named company party defendant to the suit. On August 27, 1896, J. F. F. Brewster began foreclosure proceedings upon his mortgage, covering the same lands in the mortgage of the Farmers' & Traders' Bank, and the two suits were consolidated, and upon demurrer on the part of the Western Hawaian Investment Co. they were dismissed as to the claim of the Tule Lake lands and as against the investment company November 14, 1896, and a decree foreclosing both mortgages entered February 6, 1897. The lands were thereafter sold at sheriff's sale and bought by Brewster, and no redemption made, and were then sold by him for $3,800, about the amount of his mortgage claim. In February, 1898, the Western Hawaian Investment Co. obtained a decree foreclosing its mortgage for $5,000 above mentioned in which suit most of the defendants herein were defendants, and at an execution sale under such decree it purchased all of the lands covered by its mortgages, except about 84 acres, which were purchased by the defendant W. J. Townley. This sale was con-

firmed by the court and no redemption made. The lands purchased by the investment company aggregated over 1,000 acres included within the lands purchased by defendant Townley under the sale made upon the execution issued in the case of the First National Bank of Union against Nodine. An appeal was taken from the decree of foreclosure in the Western Hawaian Investment Company case by the Farmers' & Traders' Bank of La Grande, a defendant therein, upon a question of the title to some of the lands involved therein, lying within the meander lines of Tule Lake. After the determination of this appeal, July 10, 1899 (*Western Investment Co.* v. *Farmers' Nat. Bank,* 35 Or. 298, 57 Pac. 912), the First National Bank of Union, whose judgments against Nodine were still unpaid, purchased from the Western Hawaian Investment Co., for $8,500, its certificate of sale issued by the sheriff, and had such certificate assigned to the defendant Townley, who was vice-president of the bank, as trustee for it, he being in possession of the lands as tenant of the investment company. Later, in April, 1901, after the title to the lands involved had been determined by the Interior Department and a patent issued therefor by the United States to the state, Townley bought the interest of the bank therein and had the sheriff deed the lands to him May 1, 1901, paying the bank therefor $16,500, being the balance due upon its judgments, with interest, and the amount paid by it to the investment company for the certificate.

The mortgage held by J. F. F. Brewster upon the lands purchased by Townley under the First National Bank of Union execution did not include the lands under the Western Hawaian Investment Co. mortgage or the S. D. Townley mortgage. At the time of the commencement of this present suit the only portion of the lands purchased by Townley at the execution sale in the case of the Bank of Union against Nodine not foreclosed on or sold under prior liens was about 800 acres covered by the $5,000 mortgage given to S. D. Townley, in sections 4, 5 and 9, township 4, south of range 39 E., and some fractional lots, all of which, except the lots, are included in the patent to the state above mentioned. His rights under that purchase to lands mort-

gaged to the Western Hawaian Investment Co. had been barred
by the foreclosure of its mortgage, and he had subsequently
acquired title thereto by purchase from the bank of the sheriff's
certificate issued to the investment company, and his rights to
the lands covered by the Brewster mortgage had been barred
by foreclosure of that mortgage and sale of the lands to Brewster without redemption, so that, at the beginning of this suit,
he held title to a portion of the lands formerly owned by plaintiff by purchase at the sale under the execution in the case of
the bank against Nodine, and to another portion by purchase
of 84 acres directly, and the rest by assignment of the sheriff's
certificate issued upon the sale under the execution in foreclosure of the investment company's mortgage.

After sales of these lands to Marshall and Townley in the
spring of 1896, the plaintiffs on July 13, 1896, instituted a suit
against all of the defendants herein and D. M. Jameson and
August Nelson, and one James Raymond, to have the contract
of plaintiff with the defendant Starr and the deeds and transfers made thereunder to the defendants Richmond and Wright
as trustees declared a deed of assignment for the benefit of all
his creditors, and for an accounting on the part of said trustees
for all property that came into their hands, and for damages
against them for mismanagement of the property in various
ways, and to set aside the sales made to defendants Marshall and
Townley. An amended complaint was thereafter filed in that
suit, and upon motion of the defendants the greater portion
thereof was stricken out, leaving practically as the only important question for determination by the court therein whether
or not the contract with Starr and the deeds to the trustees
made thereunder constituted an assignment for the benefit of
the creditors of the plaintiff Nodine. Answers were filed by
the various defendants and the case put at issue and testimony
taken, and the case dragged is weary length along with various
substitutions and changes of attorneys for the plaintiff, until
March, 1903, when, being set for argument upon the testimony
taken by a stenographer and reported to the court, upon motion
of plaintiff's attorneys made in open court, it was dismissed at

plaintiff's cost. Thereafter the suit was commenced, and the amended complaint upon which it was tried was filed July 18, 1904.

All of the defendants answered, except Richmond, who was not served with summons, and Starr, who, although served with summons and the original complaint, had no notice of the amended complaint upon which the case was tried. The answers denied all the material allegations regarding the failure and refusal of the trustees to account, and negligence on their part in permitting the sale of the lands upon executions, and also all charges of fraud and conspiracy and misconduct on the part of any of the defendants, but admit the execution of the contract with Starr and of the deeds to Richmond and Wright as trustees, alleging the latter to be for the benefit of plaintiffs and their creditors, but the defendant Wright claimed to hold under the deeds as a naked trustee of the title only to be transferred in accordance with the contract with Starr, and denied being trustee of the personal property. The official relations of Marshall and Connell to the Ainsworth National Bank and of Wright and Townley to the First National Bank of Union are admitted as hereinafter stated. Further defenses are plead of mortgages and judgment liens upon the land and sale thereof under executions issued under two of said judgments as heretofore stated, and confirmation of such sales and payment thereafter by the purchasers of certain mortgages and claims against the lands. The former suit dismissed by plaintiff in March, 1903, is also pleaded as a defense.

Upon trial the lower court found in effect that the defendant Wright was a naked trustee of the title only as claimed by him, and not accountable for the management of the lands or for the personal property, but that the defendant Starr was accountable to plaintiffs for $1,086.60 received by him on account of said trust, and that there was no fraud or collusion in the purchase of any of the lands upon execution sales thereof upon the part of any of the defendants, and that this suit should be dismissed as to the defendants Wright, Townley, and First National Bank of Union, but that defendant Connell, acting for the Ains-

worth National Bank, had fraudulently obtained a quitclaim deed from defendants to the land involved herein and conveyed a part thereof to Marshall, and that defendant Richmond and wife had fraudulently made a deed to Connell and one to Marshall for certain land, and that all such deeds should be set aside and canceled, and entered a decree dismissing the suit as to Wright, Townley, and First National Bank, and canceling the deeds to Connell and from him to Marshall, and from Richmond and wife to Connell and to Marshall, and awarding a decree against Starr for $1,086.60, and against Starr, Connell, Marshall and Ainsworth Bank for costs, but denying any further relief against such last named defendants. From all that part of the decree, except the judgment against Starr and the cancellation of the deeds, the plaintiffs appeal, while the defendants Connell, Marshall, and Ainsworth Bank appeal from the decree of cancellation and costs against them. MODIFIED.

For appealing plaintiffs there was a brief over the name of *Lomax & Anderson,* with an oral argument by *Mr. Leroy Lomax.*

For respondents and appealing defendants there was a brief over the names of *Crawford & Crawford, C. E. Cochran* and *Chamberlain & Thomas,* with oral arguments by *Mr. Thomas Harrison Crawford, Mr. Cochran* and *Mr. George Earle Chamberlain.*

MR. JUSTICE HAILEY delivered the opinion of the court.

1. In support of the claim for an accounting, it is alleged that the trustees have failed, neglected and refused to account to plaintiffs for the property transferred to them. To sustain the contention for damages for permitting the sale of the lands upon execution, it is charged that the trustees had in their possession and control sufficient funds arising from the trust property to have paid these claims and prevented the sales of the lands. Neither of these contentions is proved by the evidence. On the contrary, it is shown that Nodine was advised and consulted with regarding the sale and disposition of all property, real and personal, and that all proceeds therefrom were fully

accounted for by the reports made in December, 1894, and again in December, 1895, and the sale and lease to Townley, and that, so far as the rents and profits of the lands were concerned, he consented that the trustees should farm the lands and apply the crops and other proceeds thereof to the payment of the maintenance and running expenses, and the surplus, if any, to his debts, and that he consulted and advised with and assisted them in the farming operations and the management of the property and sales. The evidence shows that, instead of having trust funds on hand unaccounted for which could have been applied to the payment of the judgments upon which executions were issued, the trustees had not only exhausted all personal property in the payment of pressing claims and had done so with Nodine's knowledge, and had fully accounted to him for all receipts and expenditures, which account he had approved and accepted after having gone over it in detail, but had also used all reasonable means to sell the real estate in accordance with the terms of the contract, and failed. It was not until after all these things had been done, when all resources had been exhausted, that the executions were issued upon the judgments, and the evidence shows that at least one of the executions was issued at Nodine's request. The proof is therefore wanting to support the charge of funds sufficient on hand to pay the judgments.

2. To recover the lands or the value thereof and have canceled certain deeds thereto, fraud and conspiracy upon the part of all the defendants are charged in procuring the original contract between Starr and plaintiff Fred Nodine, and in all the subsequent acts of defendants in relation to the plaintiffs and the trust property and its proceeds. It is alleged that defendant Starr was attorney and agent for all of the defendants in procuring the contract with Nodine, and that the defendants Marshall and Connell were cashier and vice-president, respectively, of the defendant Ainsworth National Bank, and that the defendants Wright and Townley were president and director of defendant First National Bank of Union, and that the trustees, conspiring with the other defendants, failed to pay, when they

had sufficient trust funds therefor, certain judgments existing against the plaintiff Fred Nodine which were liens upon all his lands, and one of which was owned by the defendant Marshall and the other by the First National Bank of Union, and caused executions to issue thereon and upon a mortgage foreclosure decree in favor of the Western Hawaian Investment Co., and had the lands of the plaintiff sold thereunder, and prevented competitive bidding at the sheriff's sale of such lands by falsely representing that they were greatly incumbered by mortgages and other liens, and were being sold subject to such mortgages and liens, and thereby purchased the same at grossly inadequate prices, and that said trustees failed to notify plaintiff of the issuance of such executions and of the sales thereunder. It is further alleged that the defendant Connell, acting with the other defendants, by false and fraudulent representations, procured from the plaintiffs a quitclaim deed to all the lands so sold at sheriff's sale, and also by the same means procured an assignment of the plaintiff's interest in a certain suit then pending in the Circuit Court of the State of Oregon for Union County, brought by plaintiffs against all the defendants herein, except Connell, and that the defendant Richmond and wife made certain quitclaim deeds to defendants Connell and Marshall of said lands so sold to defraud plaintiffs and without their consent.

It is sufficient to say that the evidence fails to show any fraud on the part of Starr in the procurement of the original contract with Nodine, and none of the other defendants had anything to do with its inception, and Richmond and Wright were acting as trustees at the request of Starr and Nodine, but Starr was not agent or attorney for any of the defendants in that matter. The official relation of Marshall and Connell to the Ainsworth National Bank is admitted, but there is no evidence that any of them had anything to do with the management or disposition of any of the trustee property, except that Marshall, as cashier, in order to avoid the expense of foreclosing his mortgage upon a part of the plaintiff's land, caused an execution to issue upon the judgment which he had bought from Couper and

which was a prior lien to his mortgage, and had the lands sold and bought them in for the bank, all of which he had a legal right to do, for both the judgment and mortgage were prior in time to the transfers to the trustees, who took subject thereto. The only evidence upon which the plaintiffs relied to prove fraud and conspiracy upon the part of the bank or its officers in connection with the trustees in the sale under the Marshall judgment was the fact that Wright and Connell looked over plats of the lands and drove over the lands, and Wright pointed out to Connell the west boundary of the lands mortgaged to Marshall, who held for the bank.

There is no evidence whatever to support the charge of fraud in regard to the sale under the foreclosure decree of the Western Hawaian Investment Company's mortgage. Eighty-four acres of the lands sold at this sale were bought by Townley for $800, the sale confirmed and deed issued as in the other cases. The lands bought by him were separated from the main body by the investment company and adjoining other lands he had bought at the first sale. In each of these sales the judgment or mortgage lien existed long prior to the transfer from plaintiffs to the trustees, and each of the parties had a right to enforce the payment of his claim by the sale of any of or all lands upon which it was a lien. It is not contended that any of these claims were fraudulent in any way, but that the sales thereunder were collusive and fraudulent. The evidence fails to bear out the contention. Neither Marshall nor the bank of which he was a cashier was in any way connected with the plaintiffs or either of the trustees, and no duty rested upon them to refrain from buying plaintiff's lands at a sale based upon the judgment against him. The Western Hawaian Investment Company was not connected in any way with the plaintiffs or the trustees, and had a perfect right to make the amount of its debt out of plaintiff's property. The Marshall judgment and investment company mortgage, both being prior in time to the transfer to the trustees, were also, it is conceded, prior in right thereto. No confidential relations existed between either Marshall or the bank he represented, or the investment company and Nodine

or the trustees. There was no fraud or collusion, and no interference of any kind in bidding at either of these sales.

3. The only remaining reason alleged for setting them aside, if any, is inadequacy of price. This court, in accord with the great weight of authority, has held in *Farmers' Loan Co.* v. *Oregon Pac. R. Co.,* 28 Or. 70 (40 Pac. 1093), "that mere inadequacy of price, where parties stand on an equal footing, and there are no confidential relations between them, is not of itself sufficient to set aside a sale, unless the inadequacy is so gross as to be proof of fraud, or to shock the judgment and the conscience." The plaintiff personally, as shown by his letters to Starr, had made an effort to sell his lands to pay his debts, and had failed. Starr, Richmond and Wright and all the various agents by them employed had likewise failed to sell the lands, and plaintiff had been willing to accept at one time an average of $15 an acre if he could get out and have something left. After all this the lands bought by Marshall, being about 1,440 acres, were offered at public sale by the sheriff. Marshall's judgment then amounted to over $2,000. It and taxes were a first lien upon 280 acres lying about 1¾ miles east of the remaining lands levied upon, which were contiguous and also subject to the lien of his judgment and taxes, and 1,040 acres thereof subject to a subsequent mortgage in his favor for $4,000 and two prior mortgages for $4,000 each in favor of Balfour, Guthrie & Co., while 40 acres of the remaining 160 were subject to a prior mortgage in favor of the Western Hawaian Investment Company, with other lands, for $5,000 under which they were taken from Marshall, and the 120 acres were subject to a mortgage for $1,200 in favor of the Alliance Trust Company, making a total of claims against the property, other than taxes and the Marshall judgment, of over $13,200, and, adding the taxes and judgment, the liens would exceed $15,000.

4. There is evidence in the record that the entire Nodine tract was worth in 1894, 1895 and 1896 an average from $15 to $30 an acre, but much of it was swamp land, used for fall and winter pasture, and plaintiff claims in the original complaint filed in the other case, and which was introduced in evidence in this

case, that much of the meadow had been destroyed before 1896, when this sale occurred, and the evidence shows it had been badly flooded each spring by the waters of Catherine Creek, which flow through it, and was not in a good state of cultivation, being infested with fox tail and mustard to such an extent that portions of the crops had to be harvested in patches, and the evidence is strong throughout the record that it could not be sold at any reasonable price, even the lowest given by the witnesses. It is also in the record that after the Ainsworth National Bank had acquired title to the lands through the sale to Marshall, and had paid all taxes and other claims against them, it sold them for only $19,800, and gave the purchasers long time in which to make their payments. These facts are not sufficient to support the claims of inadequacy of price so far as the sale to Marshall is concerned. The sale under the decree foreclosing the Western Hawaian Investment Company mortgage is in practically the same condition. Eighty-four acres not included within the meander lines of Tule Lake were bought at that sale by defendant Townley for $800, and the remainder, about 1,000 acres, mostly within the meander lines of Tule Lake, and title to which was in dispute and on appeal in this court at the time of sale, were bought by the investment company for the amount of its decree, less the $800 bid by Townley, and afterwards sold for $8,500, which was about the amount of its judgment, costs and expenses. In view of the foregoing facts and the financial conditions then existing, and the status of the lands sold as to incumbrances and title, we cannot say that the price bid was even inadequate, and it was clearly not so grossly inadequate as to be proof of fraud or to shock the judgment or conscience.

5. Plaintiffs vigorously contend that the sale to Townley under the bank execution should be set aside. The record shows that prior to the issuance of this execution Marshall had issued execution upon his judgment and levied upon a part of plaintiff's lands, and that the Farmers' & Traders' Bank of La Grande had brought suit against plaintiff to foreclose its mortgage upon other lands, and that plaintiff, having failed in his

(48th Or.—35)

efforts under the Starr contract to sell his land, thought that
his lands must go to pay his debts, and so indicated to Wright,
and suggested that the bank, whose customer he had been, try
to save itself, and the execution was then issued, not through
fraud or collusion as claimed, but practically at plaintiff's re-
quest.    The judgment in favor of the bank was valid, and is
not questioned, and it had been docketed in December, 1893,
long before the transfer to the trustees, but was subsequent in
time to the Marshall judgment.    The execution on the latter
judgment having already been levied upon certain lands, the
execution on the bank's judgment was levied on the remaining
lands of plaintiff, which were incumbered as heretofore stated
and the title to the greater part thereof imperfect and in dis-
pute in the foreclosure suit of the Farmers' & Traders' Bank,
and also questioned by owners of lands bordering the Tule
Lake, who claimed that Tule Lake was not swamp land, but a
lake the bed of which belonged to them as riparian owners, and
one of them so far asserted his claim in the summer of 1896 as
to fence a large portion of the lands included in the Townley
mortgage, but was afterwards ejected as a trespasser.    The
lands were sold at public auction by the sheriff, and it is claimed
that Wright and Townley prevented competitive bidding, or, as
it is sometimes called, "chilled the bidding," by falsely telling
prospective bidders that the lands were greatly incumbered. The
evidence on this point is to the effect that while the property
was being offered for sale by the sheriff, in the presence of
Wright and Townley at the courthouse, N. Schoonover came out
of the courthouse and made a bid upon the property, which bid
was raised by Townley, who then told Schoonover that the lands
were being sold subject to mortgages thereon. Whereupon
Schoonover went away and the lands were bought by Townley,
the sale confirmed and deed issued without objection of any
kind on the part of plaintiffs.    Schoonover, when asked if he
had been kept from bidding, answered, "No, sir; I could have
gone on and bid for that matter." This was the only sale where
anything was said about mortgages or liens by any one so far
as the evidence shows, and the facts disclosed wholly fail to

prove the allegation of preventing competitive bidding, or that the representations made were false; but, on the contrary, the record shows that they were true. In *Leake* v. *Anderson,* 43 S. C. 458 (21 S. E. 439), a similar truthful statement made by an intending purchaser to other prospective bidders regarding the title to the land offered for sale was commended, "as it tended to prevent an unwary bidder from 'buying a lawsuit.'"

6. It is contended that the purchase was made by Townley for the joint benefit of himself, Wright and the Bank of Union, but this contention is largely based upon inferences drawn from the fact that Wright and Townley were connected with the bank at the time of the sale, the former as president and the latter as a director. So far as the bank and Townley were concerned, they owed no duty to the plaintiff, and either of them had a right to purchase at the sale for their individual or joint benefit so long as there was no collusion or fraud between them and any one who did owe a duty to plaintiff. The only evidence connecting Wright with this sale is in relation to the issuance of the execution and his presence at the sale, and the former was done at the suggestion of plaintiff, while the latter was the ordinary act of a bank officer in sales wherein his bank is interested. Even granting, as plaintiff claims, that Wright as well as Townley told Schoonover at the sale that the property was being sold subject to mortgages, it was the truth, and the same rule would apply as to the statement there made by Townley. The fact that Wright and Townley, officers of the bank, were present at the sale is not enough to warrant an inference that Townley bought for the joint benefit of all. Especially is this true in view of the fact that Townley testifies positively that he bought for himself and gives his reasons why he did so, and the sheriff's certificate of sale and the deeds thereunder were issued to him, and there is nothing in the record that contradicts these facts. It is true that some three years later, when he was vice-president of the bank, the certificate of sale for the lands bought by the Western Hawaian Investment Company was assigned to him as trustee for the bank; but at this time the plaintiff and all the defendants herein had lost all rights to the land by fore-

closure sale, and the rights which he acquired as trustee for the bank and afterwards from it for himself were not acquired as a redemptioner or in any confidential or fiduciary character, but as a purchaser from one who had rightfully acquired all rights of the plaintiffs in the lands purchased, and not for the purpose of perfecting any questionable rights he might have in the property as against the plaintiff. We fail to see wherein the claim of purchase by Townley for the joint benefit of himself, Wright, and the bank is established.

7. Inadequacy of price is also relied upon and strenuously urged to set aside this sale. The same rule applies to this sale as to the sales to Marshall and the investment company cited, *supra*. Townley was not acting as trustee or in any confidential relation to the plaintiff or the trustees. He was merely a tenant whose rights were being interfered with by an execution issued at the request of plaintiff upon a judgment prior to his lease, and as such tenant he had a right to purchase the lands: 18 Am. & Eng. Enc. Law (2 ed.), 423. The plaintiff and at least one of the trustees knew of the issuance of the execution, and the trustee was present at the sale, and under such circumstances it cannot be presumed that the purchase was for the benefit of the trustees or the plaintiff.

8. The only question then is: Was the price so grossly inadequate as to come within the rule cited, *supra?* The mortgages upon these lands have been heretofore mentioned, and at the time of sale a foreclosure suit by the Farmers' & Traders' Bank of La Grande was pending, and the title to much of the 1,800 acres embraced in Tule Lake was in dispute, and owners of bordering fractional lots were claiming as riparian owners as heretofore stated. In addition to the judgment lien of the bank the mortgages heretofore referred to aggregated, with interest, about $15,000, all prior to the judgment lien. Part of the lands were meadow lands, but floods during the three springs preceding the sale had greatly injured crops, and much of the land was foul with fox tail and mustard. Considering these facts, and the further fact that the lands bought by Brewster and the investment company were sold some time later for scarcely more than

the purchase price, and that, too, after the dispute as to riparian claims had been settled in favor of the lands, we are forced to conclude as in the other sales that the price was not inadequate.

The foregoing conclusions call for an affirmance of all that part of the decree appealed from by the plaintiffs.

9. The remaining questions relate to the quitclaim deed made by plaintiffs to defendant Connell January 8, 1897, and by Richmond and wife to Marshall and to Connell after the sale to Marshall. The record shows that after the sale to Marshall had been confirmed by the court and the sheriff's deeds issued to him in November, 1896, and he had conveyed to the bank, or J. C. Ainsworth as its representative, the bank was anxious to get its money out of the lands bought, but could make no disposition of them without first procuring the inchoate right of dower of plaintiff's wife, who had not been a defendant in the judgment under which it had sold and purchased the lands through Marshall, its cashier, or barring such right by foreclosure of the mortgages against the lands. Defendant Connell was sent to negotiate for her right, and after considerable delay a quitclaim deed was made to him by plaintiffs of all their lands that had been sold, and at the same time they assigned to him their interest in the suit then pending against the trustees and other defendants heretofore referred to, he at the time paying Nodine $1,000, which he claims was for the deed, but plaintiff claims it was for the assignment of their interest in the suit. An agreement was also signed by Connell and plaintiffs' son that one-half of the results of the suit should go to the son, and this plaintiff testifies was for the benefit of plaintiffs, so that in effect the assignment was only for one-half of the results of the suit. The testimony of Connell and two other witnesses who were present, one of whom was wholly disinterested, is to the effect that the deed was procured to secure the inchoate dower interests of Mrs. Nodine and enable his bank to get its money out of the Nodine lands, while plaintiffs claim that the deed was an after consideration to the assignment of their interests in the suit and to assist Connell in prosecuting the suit, but both deed and assignment were signed at the same time. In view of the

fact disclosed by the record that Nodine had theretofore assigned the same interest in the lawsuit to a lawyer for the same purpose he assigned to Connell, and without other consideration than that of a promise to prosecute the suit, we think the contention of Connell, supported, as it is, by the evidence of a disinterested witness, the more reasonable that the quitclaim deed was given for a consideration and for the purpose claimed by him for the bank, and that the assignment of the interest in the lawsuit was for the purpose of having it prosecuted by him, especially does this appear reasonable in view of the fact that, so far as his bank and Marshall were concerned, a motion to strike out parts of the complaint in the suit had been allowed and they were virtually out of the case. Such being the case, the deed should stand, and, the plaintiffs having thereby parted with whatever interest they might then have had in the land, they could not now question the deeds made by Richmond and wife, whose interests had been sold under the executions.

10. As heretofore stated, the decree against Starr was entered upon an amended complaint not served upon him, and under Section 100, B. & C. Comp. and *Goodale* v. *Coffee,* 24 Or. 346, 356 (33 Pac. 990), this was error. It follows that the decree must be modified as to the decree against Starr and the defendants Marshall, Connell, and the Ainsworth Bank, and a decree entered here dismissing the suit as to them, and affirming the decree in all other respects.

11. Costs will be awarded to the defendants.　　MODIFIED.