Argued January 4; affirmed February 20, 1945

# MILES *v.* SPOKANE, PORTLAND & SEATTLE RAILWAY CO. ET AL.

(155 P. (2d) 938)

Before BELT, Chief Justice, and KELLY, BAILEY, LUSK and BRAND, Associate Justices.

*Wm. P. Lord,* of Portland (Ben Anderson, of Portland, on the brief), for appellant.

*Nicholas Jaureguy,* of Portland (Cake, Jaureguy & Tooze and Hart, Spencer, McCulloch & Rockwood, all of Portland, on the brief), for respondent.

BAILEY, J. The plaintiff, a longshoreman, was injured on November 14, 1942, while engaged in loading a boat at Columbia Basin Terminals, in Portland, Oregon. Action for damages was brought by him against the Spokane, Portland and Seattle Railway Company, a corporation, the owner of the dock where the accident occurred, and the Columbia Basin Terminals, a corporation, lessee of the property. At the close of plaintiff's case the court granted defendant Spokane, Portland and Seattle Railway Company's motion for an involuntary nonsuit. Plaintiff thereupon requested and was allowed a voluntary nonsuit as to the other defendant. From the judgment of involuntary nonsuit plaintiff appeals.

In 1908 the Spokane, Portland and Seattle Railway Company, hereinafter referred to as the "railway company", constructed on the west bank of the Willamette river in Portland, Oregon, a dock and warehouse, now known as the Columbia Basin Terminals. This structure is 175 feet wide and 1,000 feet long. It is built "out into deep water", the river side being supported by piling driven into the bed of the stream. The dock consists of two stories. On the upper story, running lengthwise of the dock, is a platform which protrudes approximately ten feet beyond the warehouse and is used in loading and unloading ships. The roof of the building is from 15 to 20 feet above this platform.

The Pacific Steamship Company, a lessee of the railway company, in 1926 constructed along the river side on the roof of the dock a cargo mast, also referred to in the evidence as an "overhead beam" or a "highline lead." This superstructure extends from six to eight feet above the roof and consists of a beam run-

ning lengthwise of the dock, supported by heavy uprights and strengthened by iron braces. At intervals of four feet, eyebolts are inserted through the beam and fastened on the opposite side with nuts.

This cargo mast, in the language of counsel for plaintiff, is "designed to be used by ship's tackle as a high lead in loading and discharging cargo. The loading fall would be taken out of the ship's yardarm and a block would be placed through the eyebolt in the beam, and the ship's falls would be shackled, and the falls would thereby get a higher lifting power than afforded by the ship's loading apparatus."

The defendant railway company, on or about November 12, 1936, by written instrument, leased the premises here involved to the defendant Columbia Basin Terminals. Only paragraph 4 of this lease is before us. It is set forth in the complaint and is as follows:

"Immediately upon the execution of this lease the Railway Company will proceed without unnecessary delay to make all repairs necessary to place the dock property in good condition, and in addition, will install two new Barlow Marine elevators, or the equivalent thereof, each to have a load carrying capacity of ten tons low gear and seven and one-half tons high gear. Thereafter the lessee shall at its own cost and expense keep the warehouse in good repair during the term of this lease to the extent of all equipment, fixtures, and interior repairs above the floor joists and the concrete paving of the lower floor and below the roof (or wall) plates of the upper floor. All other repairs to the warehouse and wharf shall be made by the Railway Company except when the same have been damaged by employees or licensees of the lessee or by boats landing, lying to or departing from said wharf, which excepted injuries shall be promptly

repaired by the lessee. The term 'repairs' as used in this lease means renewal or substitution of material originally used in the construction of said warehouse and wharf and does not include extraordinary damage, destruction by fire or the elements ·or other unavoidable casualty. The lessee shall at all times keep itself informed of the conditions of the structure and shall give notice in writing to the Railway Company specifying any and all repairs which under the lease the Railway Company is required to make. The Railway Company shall not be liable to the lessee for failure to make such repairs unless after receiving said notice it shall fail promptly in the circumstances to make the repairs required, and in case of said failure on the part of the Railway Company, the remedy of the lessee shall be confined to the right to proceed with and make the repairs at its own expense and deduct the cost thereof from the monthly installments of rent to be paid to the Railway Company.''

On November 9, 1942, A. J. Witchel, chief engineer of the railway company, received a letter dated November 6, 1942, from the Columbia Basin Terminals, written by W. T. Sexton, Jr., its manager, reading as follows:

"There are, on Columbia Basin Terminals, certain repairs which must be made in order that the physical operations of the terminal company will not be jeopardized.

"The first of these repairs relates to two sections of the apron on the inland side of the terminal, which sections are sagging because of a rot to the 12 x 12 beams that underlie the apron and support it. These beams threaten to give way and collapse the first time that any heavy commodity is handled over the sections of apron which they support.

"In accordance with the provisions of paragraph four of our letter dated November 12, 1936,

this is to notify you that the above-mentioned sections of apron should be repaired.

"We also wonder if it would not be possible for your maintenance crew who will repair the apron to make certain other repairs to the terminal at the expense of Columbia Basin Terminals. Briefly, these repairs concern the renewing of a highline at the south end of the pier, replacing of certain down-spouts which have deteriorated and the patching of certain sections of the deck of the upper level of the dock.

"Let us thank you for any attention which you may give the matters which we have outlined."

Thereafter, and on the 12th of November, 1942, B. M. Howard, the structural supervisor for the railway company and the building and bridge foreman, inspected the dock and found that the horizontal beam of the cargo mast was unsafe because of its decayed condition. They reported their findings to Mr. Witchel and on the 13th day of November, Mr. Witchel wrote to the Columbia Basin Terminals the following:

"Yesterday, the 12th instant, Structural Supervisor Howard and our B&B foreman were down and looked over the work; I think they called on you while they were on the dock. The repairs that you ask are to be made without delay.

"I regret very much to have to say to you that it will just be impossible for our B&B crews to make the repairs you wanted made at the terminals which are part of your problem, the reason being that the B&B force is so extremely small and the work so heavy that we ourselves are running badly behind with our bridge repair work. I trust you will have no difficulty in finding a contractor who can do this work for you."

Plaintiff, on November 14, 1942, was working on the second story platform when a section of the hori-

zontal beam of the cargo mast, 12″ x 12″ and eight to ten feet long, fell and struck him. Although the cargo mast was being used at the time of the accident, this portion of the beam probably would not have fallen except for its decayed and rotten condition.

■ The contract between the railway company and the terminal company stipulated that the terminal company should "at its own cost and expense keep the warehouse in good repair during the term of this lease to the extent of all equipment, fixtures, * * *". The contract, however, does not define "equipment" or "fixtures". In ascertaining the intention of the parties to the contract, we may consider the circumstances under which it was made and "the situation of the subject of the instrument, and of the parties to it". § 2-218, O. C. L. A. It has already been pointed out that the dock, as originally constructed by the railway company, did not include the cargo mast, and that it was built by a lessee of the railway company in order to assist in loading and unloading ships.

One of the provisions of the lease is that the "lessee shall at all times keep itself informed of the conditions of the structure and shall give notice in writing to the Railway Company specifying any and all repairs which under the lease the Railway Company is required to make." The letter of the terminal company dated November 6, 1942, notifies the railway company that certain specific repairs should be made to the dock in order that the "operations of the terminal company will not be jeopardized." Then follows this statement:

> "In accordance with the provisions of paragraph four of our letter dated November 12, 1936, this is to notify you that the above-mentioned sections of apron should be repaired."

The writer of the letter undoubtedly had reference to paragraph 4 of the contract of lease dated November 12, 1936, hereinbefore quoted.

Following the last quoted statement, the letter of November 6, 1942, asks the railway company whether it would be possible for the railway company to repair, at the expense of the terminal company, a portion of the "highline", otherwise known as the cargo mast, at the time it repaired the apron. The answer of the railway company to this inquiry was that it was impossible for it "to make the repairs you wanted made at the terminals which are part of your problem".

In addition to these letters we have the testimony of Mr. Howard, structural supervisor of the railway company, that on his inspection of the docks on November 12, 1942, he advised the manager of the terminal company that "we could not do that particular job for them", referring to the cargo mast.

■ We therefore have a practical construction of this contract of lease by the parties to it. In referring to the construction placed upon a contract by the parties to it, this court, in *City Messenger Co. v. Postal Telegraph Co.*, 74 Or. 433, 441, 145 P. 657, said:

"    *  *  * There is no more certain way of finding out what the contracting parties meant than to ascertain what they have actually done in carrying out the contract. By so doing we learn what construction the parties themselves have placed upon the terms of their stipulation:" (Citing numerous cases). See also *Wood v. Davin,* 122 Or. 74, 257 P. 690, and authorities therein cited; *Nunner v. Erickson,* 151 Or. 575, 612, 51 P. (2d) 839; 17 C. J. S., Contracts, § 325, p. 755.

We are of the opinion that the written lease imposed the duty upon the terminal company to keep

the cargo mast "in good repair during the term" of the lease, and that the accident was due to the failure of that company to repair it. There is no allegation in the complaint nor any contention made by the plaintiff that the cargo mast was not properly constructed or that it was in a defective condition or out of repair on November 12, 1936, the date the terminal company went into possession of the property. The accident did not occur until six years later, the cargo mast having been in continuous use during the interval.

■ It is well-settled that in the absence of a special agreement to the contrary a landlord is under no obligation to make repairs upon the demised premises during the term with respect to defects not existing prior to the lease. *Asheim v. Fahey,* 170 Or. 330, 133 P. (2d) 246, 145 A. L. R. 861; *Staples v. Senders,* 164 Or. 244, 96 P. (2d) 215, 101 P. (2d) 232; *Nash v. Goritson,* 174 Or. 368, 149 P. (2d) 325; 32 Am. Jur., Landlord and Tenant, § 657, p. 521, § 705, p. 581.

■ Plaintiff contends that the foregoing rule has no application to the instant case. He argues that the right granted by § § 121-201 and 121-202, O. C. L. A., to the owner of any land "lying upon any navigable stream * * * to construct a wharf or wharves upon the same, and extend such wharf or wharves into such stream * * * beyond low-water mark" is, when exercised, a franchise; that the ownership of such a wharf "is a business affected with public use", and that the owner of a wharf cannot escape responsibility for injuries to a member of the public by leasing the property to others.

.Sections 121-201 and 121-202, *supra,* are as follows:

"The owner of any land in this state lying upon any navigable stream or other like water, and with-

in the corporate limits of any incorporated town therein, is hereby authorized to construct a wharf or wharves upon the same, and extend such wharf or wharves into such stream or other like water beyond low-water mark so far as may be necessary and convenient for the use and accommodation of any ships or other boats or vessels that may or can navigate such stream or other like water." § 121-201.

"The corporate authorities of the town wherein such wharf or wharves is proposed to be constructed shall have power to regulate the exercise of the privilege or franchise herein granted; and upon the application of the person entitled to and desiring to construct such wharf or wharves, such corporate authorities shall, by ordinance or other like mode, prescribe the mode and extent to which the same may be exercised beyond the line of low-water mark, so that such wharf or wharves shall not be constructed any further into such stream or other water beyond such low-water line than may be necessary and convenient for the purpose expressed in section 121-201, and so that the same will not unnecessarily interfere with the navigation of such stream or other like water." § 121-202.

The act just quoted (§ § 121-201 and 121-202) was passed "to encourage private parties to construct docks, wharfs, etc., for the convenience of and in aid of navigation". *Pacific Elevator Co. v. Portland,* 65 Or. 349, 381, 133 P. 72, 46 L. R. A. (N.S.) 363. It is not a grant, nor does it vest any rights until exercised. Before it is acted upon it may be revoked at the pleasure of the legislature. *Bowlby v. Shively,* 22 Or. 410, 420, 30 P. 154 (affirmed 152 U. S. 1, 38 L. Ed. 331, 14 S. Ct. 548). When the preference right or license granted to the upland owner by the statute is exercised by himself or his grantee, it becomes a vested

right. *Grant v. Oregon Navigation Co.*, 49 Or. 324, 90 P. 178, 1099.

■■ An owner of a wharf, constructed under authority granted by the statute in question, is not required to use it in any particular manner. He may devote it exclusively to his own business or may make it available to those of his own choosing. The statute does not expressly or impliedly impose any duty upon him. It permits the governing authorities of a city to regulate the exercise of the "privilege or franchise" granted and to prescribe the "mode and extent to which the same may be exercised beyond the line of low-water mark". We know of no action taken by the City of Portland to regulate the use of the dock here involved.

The rule announced in *Oregon v. Portland Gen. Elec. Co.*, 52 Or. 502, 95 P. 722, 98 P. 160, has no application to the situation before us. In that case the state of Oregon brought an action against the defendant, successor in interest of the Willamette Falls Canal & Lock Co., to recover ten per cent of the net profits arising from tolls collected by the defendant on the canal and locks at Oregon City.

Briefly, the facts in that case are: The state legislature in 1870 (Laws 1870, p. 14) granted to the Willamette Falls Canal & Lock Co. authority to construct a canal and locks at Oregon City and to operate the same upon completion thereof, and further granted to that company financial assistance in the construction of the locks. These grants were made upon the condition that the company pay to the state of Oregon ten per cent of the net profits from the tolls collected. In 1876, this company transferred all its interest in the canal and locks to the Willamette Transportation &

Locks Co., and the latter company, in 1892, assigned and transferred its interest therein to the defendant. The court held that the grant was made to the Willamette Falls Canal & Lock Co., with no power to transfer, and that without "such authority a transfer is void, and does not relieve the franchise of any of the burdens imposed by the act of its creation. These burdens are a charge upon the franchise, not upon the land as such, and may be enforced against the person or corporation exercising it." The court further held that:

"The articles of incorporation of the defendant created in it no new or independent franchise on the river. They only put the defendant in a position to succeed to the franchises of the second company; and, when it took over those franchises, it took them with just such burdens as were upon them in the hands of the first and second companies. Its articles of incorporation gave it no new or additional rights, nor in any manner enlarged the franchises."

Plaintiff cites numerous authorities enunciating the principle that a corporation, organized for the purpose of discharging certain functions for the benefit of the public, can not, by delegating those functions to another corporation or to an individual, escape responsibility for the nonperformance of those duties which are attached to the exercise of its franchise. Some of these authorities are: *Lakin v. Willamette Valley & Coast R. R. Co.*, 13 Or. 436, 11 P. 68, 57 Am. Rep. 25; *Hodges v. Johnson,* 52 F. Supp. 488; 2 Restatement of the Law, Torts, § 428, page 1149.

■ The facts in the case before us do not bring it within the foregoing rule. Nothing appears in the record to indicate that the railway company at any

time operated the dock here in question. Its articles of incorporation are not in evidence and we are not advised as to the scope of its power or the functions which it has undertaken to perform in connection with the ownership of the dock. It is not shown that the terminal company is operating the dock under or pursuant to any franchise granted to the railway company. From all that appears, the terminal company may have authority to conduct the business in which it is engaged. Moreover, as has been stated, § § 121-201 and 121-202 do not impose upon the upland owner any obligations or restrictions in the use of the wharf.

We need not refer here specifically to or discuss the cases cited in plaintiff's typewritten memorandum relating to the lessor's duty to repair defects existing at the time of the demise when the premises are leased for purposes which involve its use by the public, for the reason that, as has been pointed out hereinbefore, there is no evidence that the defect in the cargo mast existed at the time the terminal company took possession of the property.

■ It is argued by the plaintiff that the state employers' liability act, § 102-1601, to and including § 102-1606, O. C. L. A., and the safety act, § 102-1228, to and including § 102-1246, O. C. L. A., impose a duty upon the railway company to maintain the dock in a safe condition. The only section of either of these two acts to which counsel for plaintiff call attention is § 102-1229, O. C. L. A., of the safety act, and it reads as follows:

> "No employer, owner or lessee of any real property in this state shall construct or cause to be constructed or maintained, any place of employment that is not safe."

This section of the code has never been construed. Counsel for plaintiff admit that *Bent v. Jonet,* 213 Wis. 635, 252 N. W. 290, 126 A. L. R. 1245; *Neitzke v. Kraft-Phenix Dairies, Inc.,* 214 Wis. 441, 253 N. W. 579, and *Sweitzer v. Fox,* 226 Wis. 26, 275 N. W. 546, which they assert interpret a section of the Wisconsin law "of similar import" (§ 101.06, Wis. Stat. 1939), did not involve "any factual situation exactly like" the one before us. In none of these cases did the court hold that it was the duty of the owner of the property to keep it in good condition during the occupancy thereof by a tenant. In all of the cases the facts showed that the owner was in possession or control of the premises.

The Supreme Court of Wisconsin has interpreted the Wisconsin act referred to by plaintiff as not applicable to the owners of property under the factual situation involved in this case. In the decision in *Kinney v. Luebkeman,* 214 Wis. 1, 252 N. W. 282, the court said:

"That the owner is not responsible under the safe-place statute for failure to maintain the light at the stairhead is impliedly held in Freimann v. Cumming, 185 Wis. 88, 91, 200 N. W. 662, where it is said:

" 'Considering the language and general purpose of this (safe-place) statute, we now hold that in order to place such a liability (of safe maintenance) as is here claimed against one as the *owner* of such premises there must exist in such person the right to present possession or present control or dominion thereover so that such person may lawfully exercise the rights necessary to permit him to properly enter upon the premises in order to perform such an ever-present duty as is fixed by the statute.'

"The owners in the instant case had no such possession of the premises, and no such ever-present right of control or dominion thereover as to render them responsible for either constant maintenance of the light or for turning on the light whenever the stair was in use.

"That the defendant owners are not responsible upon common-law principles is obvious. When a landlord leases premises by ordinary lease 'he commits their care and the duty to keep them reasonably safe to the tenant (as he lawfully may), and hence he is relieved of liability for defects arising during the tenancy by reason of the tenant's neglect to perform that duty.' Flood v. Pabst Brewing Co., 158 Wis. 626, 634, 149 N. W. 489. With greater reason is the owner free under the common law from responsibility for a tenant's failure to maintain a light."

The railway company did not "construct or cause to be constructed" an unsafe place of employment at the time the dock was built. It was not an unsafe place of employment at the time it was leased to the terminal company, since which time the railway company has not maintained, nor was it under any obligation to maintain, the cargo mast in a safe condition.

Plaintiff, in support of his contention that the employers' liability act imposes upon the railway company the duty to see that the dock is maintained in a safe condition, cites only two cases, to wit: *Rorvik v. North Pac. Lumber Co.*, 99 Or. 58, 190 P. 331, 195 P. 163, and *Walters et al. v. Dock Commission*, 126 Or. 487, 266 P. 634, 270 P. 778, both to the point that the act covers employers whose employees mingle with others. None of the railway company's workmen were employed on the dock; therefore these cases have no application to the facts before us.

Inasmuch as the plaintiff has not called our attention to any particular provision of the employers' liability act nor cited any cases construing the act, except the two above-mentioned, we shall not discuss the act further than to say there is no evidence that the railway company has violated any of its provisions.

The judgment appealed from is affirmed.