Argued March 19; reversed July 2; rehearing denied
December 20, 1946

# PORTLAND TRUST & SAVINGS BANK *v.*
# LINCOLN REALTY CO. ET AL.

(170 P. (2d) 568)

*Nicholas Jaureguy,* of Portland (with Cake, Jaureguy & Tooze on brief), for respondents.

*O. C. Roehr,* of Portland (with Hall, Caldwell & Roehr on brief), for appellants.

ROSSMAN, J.

This is an appeal by six of the sixteen defendants from a decree of the circuit court which (1) awarded the plaintiff judgment against the defendant, Lincoln Realty Company, a dissolved corporation, for $125,000, together with costs, disbursements and an attorney fee of $3,000; (2) held that the awarded judgment was secured by a mortgage executed by Lincoln Realty

Company which described both a parcel of real property and a quantity of hotel furnishings located upon the real property; (3) ordered the foreclosure of the mortgage; and (4) directed that the real property be first sold and that, if it failed to yield sufficient for the satisfaction of the judgment, the personal property be next sold. We shall refer to the six appealing defendants as the appellants. Their title to the property was derived through judicial sales which antedated the commencement of this suit, but it is subject to the lien of the mortgage above mentioned. The respondents are three in number. One of them is the plaintiff which, by virtue of the attacked decree, is the judgment creditor. The other two are Hotel Eugene, Inc., and Hotel St. Andrews, Inc. The former is the parent of the latter and owner of all its capital stock. Both corporations have the same officers.

The real property which is mentioned in the attacked decree consists of two Portland lots which are improved with a hotel building. The property is known as the St. Andrews Hotel. The mortgage which the decree ordered foreclosed was executed June 15, 1931, by Lincoln Realty Company, owner of the property. The respondent bank was the mortgagee. The mortgage secured payment of 132 promissory notes signed by Lincoln Realty Company which totaled $140,000 and bore seven per cent. interest. Immediately upon execution of the mortgage and notes the latter were purchased by investors. The bank retained no beneficial interest in them. The mortgage described, not only the real property, but also the furniture, carpets, fixtures and refrigerative equipment in the hotel. The maturity date of the notes ranged from June 15, 1933, to June 15, 1941.

The appellants admit that a breach of the mortgage occurred as early as 1933. The assignments of error contend: (1) The amount of the judgment is excessive; (2) a lease to the respondent Hotel St. Andrews, Inc., which described the mortgaged premises and which was executed subsequent to the mortgage, should have been cancelled by the decree; (3) the personal property should have been ordered sold prior to the real property; (4) the decree should not have awarded an attorney fee; and (5) recovery upon the notes which had maturity dates other than June 15, 1941, was barred by the statute of limitations.

The principal contention which the appellants submit is that a fiduciary relationship was created July 28, 1939, between Lincoln Realty Company, aforementioned, and Hotel St. Andrews, Inc., when the two on that day signed a lease which described the mortgaged property. Under it Hotel St. Andrews, Inc., went into possession of the property as lessee. Three years later Hotel Eugene, Inc., purchased at a discount the notes which we have mentioned. Five months after it had completed the purchase it directed the respondent bank to foreclose the mortgage. The appellants, after arguing that the agreement created a fiduciary relationship between Lincoln Realty Company and Hotel St. Andrews, Inc., urge that the bank was entitled to judgment for no more than Hotel Eugene, Inc., paid for the notes, about $101,000. It will be recalled that Hotel Eugene, Inc., owns all of the capital stock of Hotel St. Andrews, Inc., and that the officers of the two corporations are the same individuals.

The St. Andrews Hotel, 95 rooms in extent, was erected in 1927. The furnishings cost about $45,000. In 1939, according to the opinion of one interested wit-

ness, the furnishings were worth about $15,000, but according to another, they were worth $27,000 to $30,-000. These estimates were based upon the premise that the furnishings remained part of an operating hotel. Their sidewalk value would have been less. Later the significance of the year 1939 will become apparent.

The St. Andrews Hotel property was encumbered, not only with the mortgage which constitutes the subject-matter of the complaint, but also with another, secondary to the one with which we are concerned. It described two other valuable properties in addition to the St. Andrews Hotel. According to the evidence, the St. Andrews Hotel property was worth nothing in 1939 above its indebtedness if all the latter, including accumulated interest, had to be paid. However, its situation was not hopeless in the event the outstanding notes could be purchased at discounts in accordance with a practice which had gained currency in the depression period.

In 1933 the Lincoln Realty Company, mortgagor, defaulted in meeting the requirements of the mortgage-secured notes. January 30, 1934, that concern executed an instrument which said that "in order to better secure the payment of the amounts due under said mortgage and notes," there was assigned to the bank "all of the rents, revenues, issues and profits now due and unpaid, and hereafter to become due from the mortgaged premises, both real and personal." The instrument recited an understanding that the Lincoln Realty Company, at the sufferance of the bank, could continue to operate the hotel and pay itself "the usual operation and management charges and expenses." It authorized the bank to take over the operation of the hotel at any time it chose and provided that in the

meantime "this assignment shall be and constitute an assignment of the net proceeds from said property only." The assignment was never cancelled, but the bank at no time asked the Lincoln Realty Company to surrender possession of the premises.

The agreement aforementioned failed to satisfy the demands of the situation, and May 18, 1936, resort was had to another which was not reduced to the form of a written instrument signed by the parties, but was evidenced by letters mailed by the bank to the owners of the notes. Under it the noteholders waived all interest unpaid at the time this agreement went into effect, and Lincoln Realty Company agreed that the net monthly proceeds of the hotel, which it paid to the bank under the assignment of January 30, 1934, should be not less than $900. One of the bank's letters said:

"The plan is as follows: * * * 2nd. That one-half of the amount paid in shall be used for payment of current and delinquent taxes. * * * 3rd. That the remaining one-half of the net income of $900 or more per month, shall be used to pay interest at the rate of 2% per annum to the noteowners, the delinquent interest to be waived, and that the balance of funds received after the interest is thus paid shall be used for the purchase of notes from the noteowners at the lowest price offered, provided that any notes so purchased are to be cancelled, thereby reducing the principal balance due on the mortgage."

When that agreement expired in 1938 it was renewed for a period ending June 15, 1941, the day when the last of the notes became due.

In order to render clear the meaning of the agreement of May, 1936, which, as renewed in 1938, expired in 1941, we summarize its provisions thus: (1) All de-

linquent interest was waived; (2) current interest was reduced from seven per cent to two per cent; (3) Lincoln Realty Company agreed that the monthly remittances exacted of it by the assignment of January 30, 1934, should be at least $900; (4) the bank agreed to discharge the taxes, current and delinquent, out of one-half of the monthly remittances and use the other half for the payment of interest and the accumulation of a sinking fund; and (5) the bank agreed to use the sinking fund for the purchase of notes at a discount and retire them after purchase. Although the respondents doubt the validity of that agreement, their brief says: "We have not, and do not, endeavor to repudiate that agreement." The latter is not decisive of any issue before us. Its significance is chronological and helpful in the interpretation of the lease which we shall shortly describe.

Before the agreement which we summarized in the last paragraph expired in 1941, $15,000 of the notes had been purchased and retired. The indebtedness was thereby reduced to $125,000. Before the agreement expired Lincoln Realty Company sought unsuccessfully to have it renewed.

Harold A. Wormser, who died December 7, 1941, was the president of Lincoln Realty Company, which owned other properties in addition to the St. Andrews Hotel. All of them were encumbered with indebtedness which proved to be burdensome as the depression which began in 1929 dragged on and increased in severity. *Ulrich v. Lincoln Realty Company,* 175 Or. 296, 153 P. (2d) 255; *Ulrich v. Lincoln Realty Company,* post p. 380, 168 P. (2d) 582; and *Foster v. Goss,* post p. 405, 168 P. (2d) 589, portray phases of the difficult financial condition of Lincoln Realty Company. Mr. Virgil Crum,

who is one of the appellants and who was the attorney for Mr. Wormser, testified concerning his client:

"He wanted to preserve these properties from foreclosure and he succeeded for about ten years against great adversity. * * * He had preserved them for ten years against the worst adversity you can imagine."

We come now to the lease, mentioned in the fourth paragraph of this opinion, which Lincoln Realty Company and Hotel St. Andrews, Inc., signed June 28, 1939. Under its provisions Hotel St. Andrews, Inc., became tenant of the real property previously described for a term of ten years. The determination of the true import of the lease is the principal issue which this appeal submits. The respondents claim that the instrument created a relationship of landlord and tenant, and nothing more. The appellants concede that the instrument created between Lincoln Realty Company and Hotel St. Andrews, Inc., a relationship of landlord-tenant, but urge that it did not stop there but went on and superimposed upon that relationship an additional one of a fiduciary character. For practical purposes we shall speak of the agreement as a lease.

Mr. Crum, who testified that he drafted the paper, swore that it constituted a part of his client's plans to secure sufficient revenue from the St. Andrews Hotel property so as to save it from foreclosure. Hotel St. Andrews, Inc., was incorporated for the express purpose of entering into the lease. All of its capital stock was taken by Hotel Eugene, Inc., which at that time was operating other hotels. Mr. Dean Vincent was president of Hotel Eugene, Inc., and became presi-

dent of Hotel St. Andrews, Inc., upon its incorporation. Mr. Wormser was made manager of both corporations.

When the lease was signed there was in effect the assignment of rents resulting from the agreement of January 30, 1934, which we have already described. There was also in effect the provisions of the agreement effected in 1936 which expired June 15, 1941. Hence, the latter ran for three years while the lease was in operation. Since the term of the lease was ten years, it would not end until June 28, 1949. The appellants, as previously stated, acquired their interests in the property involved in this suit through judicial sales, none of which occurred until 1942.

One of the provisions of the lease agreement says: "It is also agreed that the lessor is to execute to the lessee a bill of sale" covering all of the furniture and equipment in the hotel building. No separate consideration is mentioned in the lease covering the bill of sale. Concurrently with the execution of the lease and in obedience to its requirements, Lincoln Realty Company executed a bill of sale which transferred to Hotel St. Andrews, Inc., title to all the personal property in the hotel. The grantee paid nothing for the furnishings except so far as consideration is indicated by the circumstances and also by the testimony given by Mr. Vincent wherein he swore that the quid pro quo was "the signing of the lease and the agreement to pay the rent." That such was the consideration for the bill of sale is agreed by all parties; for instance, the respondents' brief says:

> "As pointed out in appellants' brief (page 86) the consideration for the transfer of the personal property was the execution of the lease by Hotel St. Andrews, Inc., and its agreement to pay the rent."

The rental was 25 per cent. of "the gross annual cash rentals received and collected" by Hotel St. Andrews, Inc., and was payable, not to Lincoln Realty Company, lessor, but to the respondent mortgagee.

The following are the provisions of the lease agreement which are material to the contention that the lease created a fiduciary relationship between Lincoln Realty Company and Hotel St. Andrews, Inc.:

"As the rental therefor the Lessee agrees to pay an amount equal to twenty-five (25%) per cent of the gross annual cash rentals received and collected by it, not including any rentals for lobby, dining room, kitchen, or rooms or offices occupied by the lessee or G. C. Ulrich Co. or its successors, or employees.

"It is the understanding that there is now a mortgage on said property held by Portland Trust and Savings Bank, which requires a minimum payment of $900.00 per month; that the furniture and equipment in said building belongs to the Lessee, but it is subject to the lien of said mortgage and is also subject to a prior purchase lien; that in order to maintain said furniture and equipment in said building for operation thereof, and in order to support the said mortgage lien, payments must be made on said prior purchase lien of $157.50 a month, which makes the minimum payment required on said mortgage and on said purchase lien $1,057.50 per month.

"It is agreed that on behalf of the Lessor the Lessee will make these payments direct each month, the Lessee to have credit on all rentals due hereunder for an amount equal to its payments on said mortgage and purchase lien. It is the understanding, however, that the Lessee only agrees to pay a rental of twenty-five (25%) per cent of its annual gross cash rentals collected by it, and any

other sums paid hereunder by it will be paid on behalf of the Lessor, due credit for which shall be granted the Lessee. Therefore, it is the understanding that if the payments so made by the Lessee to the said mortgagee and on said purchase lien amount during any one month to more than twenty-five (25%) per cent of the gross cash rentals from said building paid to and received by Lessee, then the Lessee shall have credit for the excess so paid during that month to apply against any other month in which the twenty-five (25%) percent exceeds the minimum payments made by it. It is also understood and agreed that whenever the entire balance shall have been paid on the said purchase lien, the minimum payment prescribed herein shall be reduced to $900.00 per month, or such smaller sum as may be required by the mortgagee to keep said mortgage in good standing, all other terms and conditions to remain unchanged. It is understood that after making such minimum monthly payments if there is an excess due on the twenty-five per cent (25%) basis above such minimum payment and such other payments as may have been previously made, then the Lessee shall have the right to build up a reserve of $1,000.00 out of such excesses against future periods when it may be anticipated that the earnings may be less than sufficient to enable the Lessee to make such minimum payments out of the twenty-five (25%) per cent. After building up and maintaining a reserve of $1,000.00 in this manner to enable the Lessee to carry such minimum payments without paying in excess of the twenty-five (25%) per cent earnings, then any and all amounts that might become due as rentals hereunder above the minimum and such reserve shall be paid and applied on the said mortgage. Such payments on said mortgage shall be used as far as possible in the retirement of outstanding notes secured under and by said mortgage in order that such indebtedness may be reduced as rapidly as possible. * * *

"Such minimum monthly payments shall be payable on the first of each month in advance or upon such days during the month as may be required by said mortgagee and such purchase lien. * * * In the event of failure to pay the monthly minimum payments and other rentals as herein required for a period of sixty days after they become due it shall be in default under the terms of this lease and be subject to be ejected from said premises, but shall have no other liability except for payment of rental then due. It is also agreed that the Lessor is to execute to the Lessee a bill of sale of all furniture and equipment of all kinds in use in said Hotel building, * * *.''

The bank, as mortgagee, expressed its consent to the lease by an instrument which, after mentioning the assignment of rents effected by the agreement of January 30, 1934, limited its approval as follows:

"* * * only upon the following conditions, to-wit: First, that the said mortgage and the rights thereunder shall be in no way modified, altered or changed. Second, that the rentals from the foregoing lease be included in the rents as designated in said assignment.''

It will be observed that after the lease and the bill of sale were executed Lincoln Realty Company remained owner of the real property, but Hotel St. Andrews, Inc., became owner of the personal property. The realty and the personalty together constituted the business unit known as the St. Andrews Hotel. After the lease and the bill of sale were executed Lincoln Realty Company and Hotel St. Andrews, Inc., were associated in the destiny of the heavily encumbered realty and personalty. Every dollar paid upon the mortgage obligation would lessen, not only the encumbrance upon the realty, but also that upon the

personalty of which the tenant became owner concurrently with the signing of the lease. The lease states that the sums paid monthly by the tenant "shall be used as far as possible in the retirement of outstanding notes secured under and by said mortgage in order that such indebtedness may be reduced as rapidly as possible." The rental would be earned, not only by the realty which the lessor owned, but also by the personalty of which the lessee became owner when it signed the lease. Each was essential to the other if revenue was to be yielded by either. The mortgage held by the bank covered both, and Hotel St. Andrews, Inc., as owner of the personal property, could not get its property out from under the mortgage without also getting the realty out. As is conceded, the consideration for the bill of sale was the signing of the lease; the sums which the latter was expected to yield would lift the burden of the mortgage, not only off the personalty, but also off the realty.

The lease binds the hotel company to pay a minimum of $1,057.50 monthly upon the secured indebtedness ($900 on the real estate mortgage and $157.50 upon the furnishings). It enjoins upon the lessee the duty of applying both upon the mortgage "on behalf of the Lessor." By adverting to the paragraphs of the lease which we quoted, it will be seen that the instrument says that "the rental" shall be 25 per cent. of gross. The sentence which so specifies is followed by one which declares that the real estate mortgage requires "a minimum payment of $900.00 per month" and that "in order to maintain said furniture and equipment in said building" $157.50 must be paid monthly "to support the said mortgage lien." Those words are followed by: "which makes the minimum

payment required on said mortgage and on said purchase lien $1,057.50 per month.'' Since rental is money paid by an occupant for the use of property, we shall regard the required monthly payment as the minimum rental. The basic rental, however, was 25 per cent. of gross, and the monthly minimum payment of $1,057.50 was subject to adjustment dependent upon the earnings of the 25 per cent. clause. The lease, referring to the required monthly payment of $1,057.50, said: ''It is agreed that on behalf of the Lessor the Lessee will make these payments direct each month.'' That sentence imposed upon the lessee the duty of paying $900 directly upon the mortgage and $157.50 directly upon the purchase money lien. Until the lease was signed, the duty of making those payments belonged exclusively to Lincoln Realty Company. Following the above quotation we find: ''the Lessee to have credit on all rentals due hereunder for an amount equal to its payments on said mortgage and purchase lien.'' Thus the payments made upon those obligations were the guage which determined the amount of credit to which the tenant was entitled upon rentals.

The reason for the above provisions can be readily discerned. The Lincoln Realty Company wished to bind its tenant unreservedly to pay monthly $900 upon the mortgage indebtedness and $157.50 upon the unpaid balance of the purchase price of the furnishings. Those payments had to be made, or foreclosure would face both lessor and lessee. Hence, the obligation to make those payments was expressed in unqualified language. On the first of each month, so the lease provided, Hotel St. Andrews, Inc., had to pay $900 to the bank. No offsets or counterclaims would be recognized. The lease bound Hotel St. Andrews, Inc., to make the pay-

ments "on behalf of the Lessor" whether or not the property earned anything. In turn, the lessee would get credit upon the rentals due from it under the 25 per cent. clause, but the lessor would be under no duty to repay if the venture proved to be a failure.

The succeeding parts of the lease which concern the monthly payments upon the secured indebtedness and the operation of the 25 per cent. clause provide that if $1,057.50 exceeded the demands of the clause, the lessee was entitled to credit for the excess and could use it in a month when 25 per cent. of gross exceeded $1,057.50. It likewise provided that if in a succession of months the 25 per cent. clause produced more than $1,057.50 monthly, the lessee could build up a reserve of $1,000 out of which payments could be made when the rentals were less than $1,057.50 monthly. The lessee, however, was entitled to a reserve of only $1,000, for the next sentence reads: "After building up and maintaining a reserve of $1,000.00 in this manner to enable the Lessee to carry such minimum payments without paying in excess of twenty-five (25%) per cent of earnings, then any and all amounts that might become due as rentals hereunder above the minimum and such reserve shall be paid and applied on the said mortgage."

It is obvious that the following two relationships, at least, were created by the lease: (1) a lessor-lessee relationship, and (2) a debtor-creditor relationship based upon the rentals in which the latter stood assigned to the bank.

We said in a preceding paragraph that notes of the face value of $15,000 were retired before this suit was filed. By the time the lease became effective $10,000 of the notes had been discharged. After the execution

of the lease and before the expiration of the agreement of 1936, which occurred June 15, 1941, $5,000 more were retired. Thereafter no more were paid, although it will be observed that the language quoted in the preceding paragraph from the lease contemplated that the mortgage indebtedness should be "reduced as rapidly as possible" by the application of the rental upon the mortgage indebtedness.

Leland B. Arnett, an accountant, upon the request of the appellants, examined the rental account of Hotel St. Andrews, Inc., for the period, July, 1939, to and including October, 1942. His unchallenged testimony shows that the lessee was delinquent at the end of that period to the extent of $6,545.65 in meeting the demand that it pay monthly $900 upon the real estate mortgage. Itemized rental sheets prepared by Mr. Vincent's office covering the seven-month period beginning April, 1942, are before us. In those seven months the cash receipts from room rentals and 25 per cent. of that sum were, respectively:

| | | |
|---|---|---|
| $ 4,338.30 | 25% is $ | 1,084.57 |
| 4,781.08 | " " | 1,195.27 |
| 5,066.16 | " " | 1,266.54 |
| 5,338.86 | " " | 1,334.71 |
| 5,573.45 | " " | 1,393.36 |
| 5,571.98 | " " | 1,392.99 |
| 5,533.05 | " " | 1,383.26 |
| $ 36,202.88 | $ | 9,050.72 |

In those seven months the lessee paid only $5,400 upon the mortgage (six times $900). But in each of those months, it will be seen from the above figures, the lessee should have paid more than $900. The above sums total $36,202.88, and 25 per cent. of that total is $9,050.72, or $3,650.72 more than the lessee paid. Since

the lease says that the lessee is entitled to credit upon the 25 per cent. rental for the monthly installment of $157.50 which the lease required it to pay upon the furnishings, we must reduce the sum of $3,650.72 by $1,102.50 (seven times $157.50) and we have $2,548.22. By adding $6,545.65 to $2,548.22 we have $9,093.87. But to get the figure which will accurately represent the lessee's arrears, we must deduct $900 from $9,093.87. The $900 just mentioned represents the payment which the lessee should have made in April, 1942, but failed to make. Since Mr. Arnett took it into account in computing his sum of $6,545.65, and we did not in arriving at our figure of $2,548.22, we must now deduct it from the above total of $9,093.87. After making the subtraction we have $8,193.87, the total arrears on November 1, 1942. In making that statement we assume that nothing more than $900 monthly was called for up to April 1, 1942. If something more was payable, the arrears were, of course, greater than our figure indicates. The bank kept no records showing the hotel's earnings and none are available to us prior to April 1, 1942.

Beginning with June, 1942, the bank called the attention of Hotel St. Andrews, Inc., to its delinquency in the payment of rental. Correspondence had between the hotel and the bank upon the subject culminated in an admission by the hotel in October that the lease demanded it pay as rental 25 per cent. of its gross receipts. From that time on it paid 25 per cent. of gross, with the exceptions which we shall later mention. Beginning in the summer of 1942 the earnings under the 25 per cent. clause monthly exceeded $1,057.50 by a substantial margin, and since the lease authorizes the use of excess toward defrayment of advances made in

months when the rentals did not amount to $1,057.50, we are going to assume that the excesses discharged the aforementioned delinquency of $6,545.65.

■ After Hotel St. Andrews, Inc., became the tenant of the property it made repairs to the structure totaling $11,629.47. One of the items amounting to $1,500 was authorized by one of the appellants and we shall, therefore, disregard it and reduct $11,629.47 to $10,129.47. The repairs were made by the hotel upon its own volition and were paid for by it directly. As each item was discharged its amount was withheld from the monthly remittance made to the bank. We shall illustrate by using the months of July, August and September, 1944. The room rentals collected by the hotel in those months were, respectively, $6,385.40, $6,683.90 and $6,330.25. Twenty-five per cent of those sums are, respectively, $1,596.35, $1,670.97 and $1,582.56. Those are the rentals that should have been remitted. However, since the lessee had become heavily indebted to Reimers & Jolivette for repair work, it did nothing in those three months except send the bank statements showing the figures just mentioned and also showing that it had paid Reimers & Jolivette in those months the respective amounts of $1,596.35, $1,670.97 and $1,582.56. Nothing was remitted in cash for any one of those months. The lease contained no provision requiring the landlord to make repairs, and therefore the rentals should not have been applied to defray their cost. *Miles v. Spokane, Portland & Seattle Railway Co.,* 176 Or. 118, 155 P. (2d) 938, and *Nash v. Goritson,* 174 Or. 368, 149 P. (2d) 325. Those decisions are typical of the universal rule.

If $10,129.47 of rental money had not been diverted to unauthorized purposes but had been ''paid and

applied on the said mortgage", as the lease required, "in order that such indebtedness may be reduced as rapidly as possible", the indebtedness would have been reduced $10,129.47. Likewise, had there not been a delinquency of $2,548.22 in the payment of rent (April to October, 1942) there would have been $2,-548.22 more money for the reduction of such indebtedness.

In order to determine the full amount of the sums which were diverted from the purposes mentioned in the lease, it is necessary to mention an item which is conceded. The lessee disbursed $2,214.36 of rental money in payment of personal property taxes, insurance premiums upon personalty and the purchase price of carpet. The respondents admit that the lessee should have borne these expenses itself. The total of $2,214.36, $2,548.22 and $10,129.47 is $14,892.05. Whether or not the appellants are in position to question the use which was made of those moneys remains for consideration. For present purposes it suffices to say that if the above sums had been "paid and applied on the same mortgage," the latter would have been reduced $14,892.05 and the unpaid balance of the mortgage would have been $110,107.95.

■ Before describing the purchase of the notes by Hotel Eugene, Inc., we shall advert to the fact, previously mentioned, that Hotel Engene, Inc., caused Hotel St. Andrews, Inc., to be incorporated and after its incorporation became the owner of all of its capital stock. The memorandum opinion of the Circuit Court judge, from whose decree this appeal has been taken, says:

> "For purposes of this case it is admitted the Hotel Eugene, Inc., and the Hotel St. Andrews, Inc., are subject to the same controls, and no reliance is placed on any difference in corporate entity so

far as legal significance attaching to ownership of the notes is concerned."

This appears to be an instance in which a subsidiary corporation was formed by its parent for the purpose of making the subsidiary an agency of the parent. The officers of the parent became the officers of the subsidiary. The facts authorize us to deem the two corporations as one and the same entity: *Murray v. Wiley,* 169 Or. 381, 127 P. (2d) 112, 129 P. (2d) 66, and annotations 1 A. L. R. 610 and 34 A. L. R. 599.

The purchase of the notes began in November, 1942. The names of their owners were obtained from the bank, and apparently the purchase progressed without the appellants receiving any intimation of it. Hotel Eugene, Inc., borrowed from the respondent bank $50,000 with which to make the purchases and secured the payment of the borrowed sum with a pledge of the notes. March 26, 1944, the last of the notes was purchased and thereupon Hotel Eugene, Inc., owned all of them.

Mr. Vincent testified that the total cost of the notes was between $101,000 and $102,000. Five months after the last of the notes was purchased this suit was filed. It is conceded that its institution was upon the direction of Hotel Eugene, Inc.

We have mentioned the fact that by virtue of the agreement of 1936 interest upon the notes was reduced to two per cent. That agreement expired June 15, 1941. Nevertheless the bank, after June 15, 1941, and until all the notes were acquired by Hotel Eugene, Inc., continued to remit to the noteholders only two per cent. interest. The small amount was due to the fact that the lessee's payments to the bank were insufficient to warrant the payment of more than two per cent. However, after Hotel Eugene, Inc., acquired

the notes it reinstated the seven per cent. interest rate and dated it back to June 15, 1941. It will be recalled that beginning with October 1942, the lessee's remittances were based upon 25 per cent. of gross and that they brought to the bank a much larger sum after payment for the repairs had been discharged. As soon as large amounts began to accumulate in the bank's hands, Hotel Eugene, Inc., demanded disbursement to itself of the accumulations in payment of the reinstated interest of seven per cent. It received in that way $16,349.27. It seems reasonable to infer that the small rental payments by the lessee which were made in the period when the notes were being purchased by Hotel Eugene, Inc., had a depressing effect upon the noteholders and induced them to part with the notes at a discount.

The appellants, as we have indicated, acquired their interests in the property before us through judicial sales which we will now describe. May 28, 1942, an application was presented to the Circuit Court for Multnomah County for the appointment of a general receiver for Lincoln Realty Company. It was made in a suit entitled *M. B. James v. Lincoln Realty Company*. The court appointed one L. C. Simms receiver. July 30, 1942, the court entered an order which directed Simms, as receiver, to sell to the appellant, George A. McFaul, all of the property which Lincoln Realty Company then owned including the St. Andrews Hotel and its furnishings. The price fixed by the court was $500. The sale, of course, was subject to all encumbrances against the properties. July 30, 1942, the necessary deeds and bills of sale were executed and delivered.

January 17, 1942, which was prior to the sale described in the preceding paragraph, a suit was in-

stituted for the foreclosure of a mortgage which encumbered all three parcels of real property owned by Lincoln Realty Company and which was secondary to the one with which we are now concerned. A decree was entered August 4, 1942, which foreclosed the mortgage. The foreclosure sale was held October 26, 1942, and the property was sold to the defendant, W. C. Foster. October 1, 1943, the appellant, McFaul, served notice of intention to redeem the property from its sale. His right to do so was contested, but was affirmed by this court in *Ulrich v. Lincoln Realty Company,* supra. Redemption was made by the payment of $37,000. May 5, 1942, one W. W. Banks secured a judgment against the Lincoln Realty Company and upon execution sale the property was sold for $759.01 to Earl Goss, one of the appellants. The deed was delivered April 5, 1944. In the manner described in these two paragraphs the appellants secured their title to the property. The above will suffice for present purposes as a statement of the facts.

The appellants, in pursuing their contention that a fiduciary relationship existed between Lincoln Realty Company and Hotel St. Andrews, Inc., argue that a tenant, while in possession of the demised premises, is not permitted to acquire an encumbrance upon the property and assert it against the lessor. They urge that if he actually purchases an encumbrance he will not be permitted to foreclose it for more than he paid for it.

 In *Flat-Marks Realty Corp. v. Silvers Lunch Stores,* 74 Fed. (2d) 210, Judge Learned Hand said ''the relation of sub-lessee to sub-lessor is not fiduciary.'' He pointed out:

> ''A lessee owes no duty to his lessor beyond those contained in the lease; he does not assume

to act for him in any particular; only to perform the express promises which it contains.''

In Oregon the rule that a tenant may not dispute his landlord's title applies only to the title as it existed at the commencement of the relationship: § 2-406, subd. 5, O. C. L. A.; *Bobell v. Wagenaar,* 106 Or. 232, 210 P. 711; and *West Shore Mills v. Edwards,* 24 Or. 475, 33 P. 987. An ordinary lease, in this state, creates no fiduciary relationship between lessor and lessee: *Nodine v. Richmond,* 48 Or. 527, 87 P. 775. That being true, a tenant is at liberty to purchase the demised premises at an execution or foreclosure sale: *Bobell v. Wagenaar,* supra, and *Nodine v. Richmond,* supra. Our decisions are in keeping with the weight of authority: 32 Am. Jur., Landlord and Tenant, § 117, p. 121, and Tiffany on Landlord and Tenant, § 78. We remain satisfied with them. The appellants, however, argue that a tenant, while in possession of the demised premises, is not permitted to acquire a lien or encumbrance against the property. We know of no reason why a distinction should be made between the acquisition by the tenant of a paramount mortgage or other encumbrance and the purchase by him of a paramount title. The authorities upon which the appellants rely are cited in part and criticized in Tiffany on Landlord and Tenant, § 78, p. 461.

The appellants go on and argue that even if an ordinary lease creates no fiduciary relationship between lessor and lessee, the present one imposed such a relationship because, according to them, it contains unique features.

In construing the relationship which the lease created between the parties, we must take into consideration their needs and purposes so far as they

were rendered evident. The pressing need and manifest purpose of Lincoln Realty Company was to support the mortgage and, if possible, reduce it to the point where it could be refinanced. The lease evidences that need and purpose. For ten years Mr. Wormser had struggled to save his properties from foreclosure. His hopes of saving the St. Andrews Hotel property from foreclosure were lent encouragement by the results achieved under the assignment of rentals which was made in 1936. The assignment netted sufficient income to retire $10,000 of mortgage indebtedness in the three-year period which ended with the signing of the lease in June, 1939. That result was achieved when the money available monthly from the property was only $900 and when one-half of it had to be employed in the discharge of taxes. Moreover, it was accomplished in the midst of a prolonged depression. If an arrangement could be brought about whereby a tenant would have a goading interest to squeeze from the property a still larger sum, the property possibly could be salvaged from impending disaster. One of the witnesses expressed the belief that if the mortgage indebtedness could have been reduced to $100,000 refinancing would have been possible.

When the lease was under consideration the St. Andrews Hotel property and others consisting of hotels and apartment houses were being managed by a concern entitled G. C. Ulrich Company. Mr. Wormser appears to have been an official of that concern and it was related somehow to Lincoln Realty Company. Since an operator was in charge of the hotel, a new arrangement would not be desirable unless it offered a superior means of solving the financial problems of the property. Inasmuch as Hotel St. Andrews, Inc., continued Mr. Wormser as manager after the lease

was signed, it appears that his services had been satisfactory. It likewise appears from the same premise that the lease agreement was intended to yield Lincoln Realty Company some benefit which lay beyond Mr. Wormser's reach.

The lease agreement effected some important improvements for the noteholders over the assignment. It ran for a definite period—ten years. It unconditionally bound Hotel St. Andrews, Inc., to pay and apply $900 a month upon the mortgage. In like terms it bound Hotel St. Andrews, Inc., to pay $157.50 monthly upon the balance of the purchase price of the furnishings. Although the success of the assignment was dependent upon room rentals, the promise of Hotel St. Andrews, Inc., to pay "the minimum payment required on said mortgage and on said purchase lien of $1,057.50 per month" was unqualified. Hotel St. Andrews, Inc., was the subsidiary and alter ego of Hotel Eugene, Inc., which was in such good circumstances that it could invest more than $100,000 in notes. Thus the promises were made by a party which had good connections. Every month in which the 25 per cent. clause yielded in excess of $1,057.50 there would be available more than $900 for the mortgage. After the date of the lease the bank and the note owners would no longer have to deal with Lincoln Realty Company, whose shaky condition no doubt had been a cause for concern. From that time on Hotel St. Andrews, Inc., would have its shoulder under the mortgage and a duty to pay "on behalf of the Lessor."

The payment of $900 monthly on the mortgage and $157.50 on the purchase lien had to be made "on behalf of the Lessor." Possibly the quoted words were written into the lease to thwart any possibility that the payor (Hotel St. Andrews, Inc.) would become the

owner of the obligations upon which it was required to make payments. See 8 C. J., Bills and Notes, § 826, p. 588, and 10 C. J. S., Bills and Notes, § 451, p. 988. Another possible explanation is that, since the lessor in writing the lease had unbosomed itself and had disclosed to the lessee, not only its precarious financial condition, but also the identity of those who held a sword of Damocles over its head, it wished the tenant to understand that it must act ''on behalf of the Lessor'' in its dealings with the bank and the unpaid vendor of the furnishings. A third possibility is that Lincoln Realty Company wanted its tenant to perform the service required by the assignment ''on behalf of the Lessor'' so that the mortgagee would have no occasion to claim that a violation of that agreement had occurred.

Evidently one of the benefits which Hotel St. Andrews, Inc., wanted to secure for itself through signing the lease was to become owner of the hotel's furnishings. Mr. Vincent estimated their value at $15,000. Another witness thought they were worth $27,000. They were encumbered with a lien of $4,000 of unpaid purchase money, but it was payable out of rentals. If the furnishings were worth $15,000 they were the equal of 16½ months' payments of $900 each upon the mortgage; if their value was $27,000 they equalled 30 payments. Seemingly it was the desire of Hotel St. Andrews, Inc., to become owner of the furnishings which enabled lessor and lessee to come to a meeting of minds.

The lease imposed upon Hotel St. Andrews, Inc., the following duties which it had to perform each month: (1) pay and apply $900 on the mortgage and $157.50 on the purchase price lien; (2) calculate the

amount earned by the 25 per cent. clause; and (3) if more than $1,057.50 was earned by the 25 per cent. clause, use the excess as follows: (a) discharge advances made in prior months when 25 per cent. of gross was less than $1,057.50; (b) if all advances had been discharged, place the excess in the reserve fund if the latter amounted to less than $1,000; (c) if all advances had been discharged and the reserve fund held $1,000, pay the excess upon the mortgage.

The appellants, referring to the lessor and the lessee, argue that "they occupied a position in all respects analogous to that occupied by cotenants of mortgaged premises * * * the arrangement placed the parties in a position analogous to that of joint adventurers, if not partners, in the hotel business for the ten year duration of the lease * * *. In making such disposition of the landlord's rentals, the lessee was, if not a trustee, at least an agent."

 We are certain that there was no cotenancy between Lincoln Realty Company and Hotel St. Andrews, Inc. Neither ownership nor the right to possession extended to the entire mortgaged property. Likewise, we are convinced that the lease did not render the lessor and the lessee joint adventurers in the operation of the hotel. In the first place, we do not believe that the realty company and the hotel company intended to become joint adventurers. Next, joint control and proprietorship, as well as an agreement to share the profits, are generally essential to a joint adventureship: 30 Am. Jur., Joint Adventures, §§ 10 and 12, p. 682. The following is taken from 33 C. J., Joint Adventures, § 6, p. 843:

"The mere fact that a hotel, opera house, or other business building or property is leased under

an agreement that the lessor is to receive as rent or in addition to the rent a stipulated portion of the net profits derived by the lessee from the business conducted therein does not constitute the agreement one of joint adventure so as to give the lessee the rights or subject the lessor to the liabilities of that relation. But, if the agreement goes further and gives to the lessor any control over the business conducted in the leased premises, it is usually construed to constitute the parties joint adventurers in respect to third persons."

From 35 C. J., Landlord and Tenant, § 12, p. 955, we quote:

"The relationship of landlord and tenant is distinct from that of partners. If the agreement creates a business fiduciary relation between the parties, it is more properly denominated a 'partnership agreement' or 'quasi partnership agreement' than a 'lease.' If the relation of landlord and tenant otherwise exists, the mere fact that the owner is entitled to compensation measured by the portion of the profits does not change the relation of tenancy between the parties so as to create the relation of partnership, especially where there is no agreement to share losses, or where the owner reserves no control over the premises."

The lease before us retained in the landlord no right whatever to share in the control of the leased premises.

■ Notwithstanding the fact that all members of this court take the above views, which are contrary to the contentions of the appellants, three (Kelly, Hay and Rossman, JJ.) believe that the lease made the tenant the fiduciary of its lessor in its dealings with the mortgagee. The three believe that in making monthly payments upon the mortgage, the hotel company had

virtually stepped into the shoes of the mortgagor. Although the points of view of the three are not entirely similar, they do not believe that Hotel St. Andrews, Inc., was at liberty to purchase the mortgage upon which it had agreed to make payments, and which it had also agreed to keep in good standing and to reduce as rapidly as possible. See, for illustration, 35 C. J., Landlord and Tenant, § 602, p. 1246. The majority (Belt, C. J., Bailey, Lusk and Brand, JJ.), however, believe that the money which Hotel St. Andrews, Inc., paid monthly to the respondent bank was nothing but rental money and that when it made the payments it was not a fiduciary but a debtor. It will be recalled that "the rentals" had been assigned to the mortgagee. The majority do not believe that the lease imposed any duty upon Hotel St. Andrews, Inc., in addition to its duty as a tenant. The differences in our points of view have been thoroughly debated. We do not differ upon any principle of substantive law, but only upon the construction of the lease. In view of the above, it is the opinion of the court that the lease created no fiduciary relationship between Lincoln Realty Company on the one hand and Hotel St. Andrews, Inc., or Hotel Eugene, Inc., on the other. Neither of those corporations owed a duty to purchase notes on behalf of the lessor nor to refrain from buying any. Hotel Eugene, Inc., when it purchased the notes, was at liberty to do so, and was not bound to give Lincoln Realty Company the benefit of the discounts which it gained.

■ Before considering further contentions which are made under the first assignment of error, we shall pass on to other assignments of error. The second is predicated upon a claim that the circuit court should

have cancelled the lease on account of the lessee's violations of the terms of that instrument. Previous pages of this opinion mention the breaches.

Mr. Crum, who is one of the appellants and who was counsel for the plaintiff in the suit wherein foreclosure of the second mortgage was decreed, testified that the lien of the latter was superior to the lease. After he had given that testimony, Mr. Crum, under examination by Mr. O. C. Roehr, another of the appellants, and who is their counsel, testified as follows:

"Q. Was the lease foreclosed at the time the second mortgage was foreclosed?
"A. No.
"Q. What was the reason for that?
"A. Well, there were two or three reasons. The tenant was in possession, was operating and paying rental to the mortgagee, and if there was any value that could ever be gotten out of the real property it was by letting the tenant stay in. So that we didn't want to foreclose. The other reason was that two of the three clients that I represented were interested in it; that was a valuable asset to them. Their interest in the second mortgage was quite doubtful, so that it would have been ridiculous to try to foreclose their interests out in this foreclosure."

No one contradicted or challenged that testimony, and no one doubts the wisdom of the course which Mr. Crum pursued. A fact which we have not mentioned, but which is important, is that when the lease was signed the demand for hotel rooms which began to manifest itself in 1942 had not taken place and the success of the lease was not a certainty. When Mr. Crum concluded not to ask for a cancellation of the lease, most of the breaches of that instrument had taken place for which cancellation is now sought. Un-

less we misinterpret the testimony, Hotel St. Andrews, Inc., made extensive repairs to the structure and installed in it expensive new furnishings after the complaint in the second foreclosure suit was filed. Possibly it deemed Mr. Crum's action as tantamount to a waiver of the right to cancel the lease for existing breaches. We observe that the counterclaim filed by the appellants, in which they ask for a cancellation of the lease, says that Hotel St. Andrews, Inc., paid ''the minimum requirements as set forth in its lease.'' Although that statement is not true, nevertheless, since it appears in the counterclaim, the failure of the lessee to have maintained the payments upon the mortgage is not available as a basis for the cancellation of that instrument. We must assume that the breach was waived as a ground for termination. The repairs to the structure for which payment was made out of rental money, so far as we know, were necessary, and the appellants will seemingly obtain the benefit of them if they redeem. The only development that occurred since Mr. Crum elected not to ask for a cancellation of the lease was the conduct of the lessee in purchasing the notes, but, since we have held that it had a right to make the purchases, its conduct in so doing did not constitute a breach of the lease. In view of the above circumstances, we conclude that the second assignment of error affords no basis for vacating the decree.

The third assignment of error urges that the attacked decree should have ordered that the personal property be sold before the realty.

The appellants do not challenge the general rule, employed in *Oliver v. Wright,* 47 Or. 322, 83 P. 870,

that upon the foreclosure of a paramount mortgage which encumbers property later sold in parcels at different times to different persons, the separate tracts shall be sold in the inverse order of their alienation. See 35 Am. Jur., § 32, p. 399. They, however, contend that there is an exception to the rule, which they state thus:

"Where two parcels of property are sold subject to a common mortgage to different parties at different times and the first parcel alienated has been transferred either without consideration or in consideration of the payment, part or in full, of the common encumbrance, or the consideration agreed to be paid has not been paid, equity requires that upon foreclosure of the common mortgage the first parcel alienated must be sold first * * * where, as in this case, the property first alienated has been transferred without consideration * * *."

We pointed out in preceding paragraphs that the personal property was not transferred without consideration. The bill of sale which described it was delivered to Hotel St. Andrews, Inc., in consideration of its execution of the lease. It cannot be said that the bill of sale was delivered "in consideration of the payment" of the secured obligations, for the lease itself declares: "The Lessee assumes no obligation, guarantee, or responsibility on either said mortgage or said purchase lien."

Without expressing any opinion concerning the existence of the purported exception, it suffices to say that the appellants have not brought themselves within its assumed embrace. We hold that the third assignment of error is without merit.

■ The fourth assignment of error says:

"The Court erred in allowing the respondents a decree for costs and attorney fees."

It is based upon a contention that the appellants, in a letter dated August 14, 1944, tendered to the respondent bank the full sum due upon the notes and mortgage. The letter was written by Mr. O. C. Roehr, one of the appellants, and was in response to a letter written August 11 by Mr. Nicholas Jaureguy, attorney for the respondent bank, in which he evidenced a purpose to proceed with the foreclosure of the mortgage. In his letter Mr. Roehr stated:

"The present owners of the building, whom I represent, are ready and willing and able to pay their pro rata share of the cost of these notes and are willing to and do tender you such payment. In that manner the mortgage may be satisfied. If you will advise us the cost of these notes and expenses incurred to date and the pro rata share required from my clients in full, we are prepared to take them up. We are now making you a tender on that basis, * * *."

Mr. Jaureguy, on August 22, replied:

"We are at a loss to understand what you mean when you say that the present owners are willing to pay 'their pro rata share of the cost of these notes.'"

Mr. Jaureguy's letter, after itemizing the sums which he thought were due, continued:

"We do not construe your letter as an offer to pay the present balance on the mortgage, together with expenses. We are sending a copy of this letter to each of the parties who, we are advised,

are interested with you in this property so that if we are in error, we may be corrected immediately."

No reply was made to that letter. Although the answer mentions the purported pro rata tender, it did not renew it or bring any money into court.

We do not believe that the course taken by the appellants constituted a compliance with §§ 10-920 and 72-101, O. C. L. A. We find no merit in this assignment of error.

■ The fifth assignment of error claims that the circuit court erred when it refused to decree that the lien of all notes secured by the mortgage and having a maturity date other than June 5, 1941, expired prior to the institution of this suit by virtue of §§ 68-111 to 68-113, O. C. L. A. The appellants say that they "desire to waive their defense if they are given the relief otherwise prayed for."

The mortgage was executed June 15, 1931. Section 68-111, O. C. L. A., says:

"If the date of the maturity of such obligation or indebtedness is not disclosed by the mortgage itself, then the date of the execution of such mortgage shall be deemed the date of the maturity of the obligation or indebtedness secured or evidenced by such mortgage."

Therefore, if we must conclude that June 15, 1931, was the date of "the maturity of the obligation," then, since the first sentence of § 68-111 says: "No mortgage upon real estate * * * shall be a lien * * * after the expiration of ten years from the date of the maturity of the obligation of indebtedness secured or evidenced by such mortgage * * *, we shall be forced to hold that the mortgage in part ceased to be a lien

June 15, 1941. The mortgage recites that it was given to secure the payment of "132 certain promissory notes, bearing even date herewith, maturing June 15, 1941." In truth, all did not have maturity dates of June 15, 1941.

Since § 68-111 speaks of "the maturity of such obligation or indebtedness," thus using singular nouns, we do not believe that it intended to bar the mortgage as to part of this obligation and leave it intact as to the balance. We think that our statute refers to the lien and not to the liability. Hence, in this instance, the mortgage properly recited as the date fixed for the lien the day when the last of the notes became due. See *Lawman v. Barnett,* 180 Tenn. 546, 177 S. W. (2d) 121, 153 A. L. R. 772. This assignment of error is without merit.

■■■■ We return to the first assignment of error. It will be recalled that it attacks the amount of the awarded judgment. The appellants argue under this assignment of error, not only that the respondents were entitled to recover no more than Hotel Eugene, Inc., paid for the notes, but also that there should have been deducted from that sum the total of the unpaid rentals, which a previous paragraph of this opinion finds to be $14,892.05. It was the duty of Hotel St. Andrews, Inc., to have paid that sum upon the mortgage indebtedness; in other words, to have reduced the debt to that extent. The appellants, as the successors to the title of the lessor, are entitled to all of the benefits of the lease: Tiffany on Landlord and Tenant, § 148. It is our belief that the judgment is excessive to the extent of at least $14,892.05. It is apparent that rentals have become due since the complaint was filed, and, of course, so far as the record goes, they have not been

applied upon the mortgage debt. The circuit court should determine their amount. If a part of their total was applicable to the payment of interest or of taxes, the proper deductions should be made. The balance should be applied upon the mortgage.

The challenged decree is set aside and the cause is remanded to the circuit court to enter the proper decree. Costs and disbursements will be awarded to the appellants.